**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Marius CANOY, Defendant–Appellant.**

**No. 93–3315.**

United States Court of Appeals,
Seventh Circuit.

Argued April 21, 1994.

Decided Oct. 20, 1994.

Madeleine S. Murphy, Asst. States Atty., argued, Barry Rand Elden, Jerome N. Krulewitch, Asst. U.S. Attys., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Christopher W. Graul, Stanley L. Hill, Hill & Associates, James Darryl Tunick, argued, Chicago, IL, for defendant-appellant.

Before CUMMINGS, MANION, and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

A jury convicted Marius Canoy of making a telephone call to the Kemmerer Bottling Company ("Kemmerer") on March 28, 1989, and falsely representing that the Tylenol in the company's medicine cabinet had been tainted with cyanide. In sentencing Canoy for this offense, the district court initially departed downward from the applicable Sentencing Guidelines range based on Canoy's extraordinary family circumstances. On reconsideration, however, the district court concluded that our decision in *United States v. Thomas,* 930 F.2d 526 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991), prohibited a departure on that ground, and it thus resentenced Canoy at the very bottom of the Guidelines range. In this appeal, Canoy raises several challenges to his conviction. He also asks that we revisit the holding in *Thomas* that even extraordinary family circumstances may never support a downward departure from a Guidelines sentencing range. We reject Canoy's attempts to overturn his conviction, yet because we find his challenge to our *Thomas* decision well-taken, we vacate his sentence and remand for resentencing.

## I. BACKGROUND

Shortly before 3:00 p.m. on March 28, 1989, Catherine Claassen, a payroll clerk at a Kemmerer bottling plant, picked up the telephone of an absent coworker and heard a male voice with a foreign accent say, "Your Tylenol in the medicine cabinet is laced with

cyanide." "Pardon me" was Claassen's response, and the man then repeated that the Tylenol in the medicine cabinet had been laced with cyanide. Claassen hung up the phone and immediately reported the call to her supervisor. The two then retrieved the Tylenol packages from the medicine cabinets and took them to the company's vice president of human resources, who contacted the United States Food and Drug Administration (the "FDA"). The FDA subsequently tested the Tylenol packages for cyanide, but the tests were all negative.

The materials in Kemmerer's medicine cabinets, including the allegedly tainted Tylenol packages, had been supplied by Safety Plus, a first aid and safety supply company owned by Allen Jones. Before becoming a customer of Safety Plus in January or February 1987, Kemmerer had received its medical supplies from Zee Medical Service ("Zee"), Jones' former employer and, coincidentally, the employer of defendant Canoy. In 1988 and 1989, Zee and Safety Plus competed for customers in the thirty-mile radius where Safety Plus conducted business, although Safety Plus had obtained between eighty and ninety percent of the customers in that area.[1] Canoy was the Zee salesperson assigned to the territory that encompassed the Safety Plus sales area, and Zee compensated Canoy solely on the basis of his sales commissions.

Near the end of 1988 and early in 1989, Jones and/or Safety Plus began to receive or became the object of a number of harassing telephone calls. For example, in November 1988, Jones received a call from a man who purported to represent a prospective Safety Plus customer. The man wanted to place an unusually large order contingent on delivery by 5:00 p.m. that day. Jones immediately realized the order was fictitious. Indeed, he recognized the man's voice as that of Canoy and said, "Look, Marius, why don't you just go back to work and leave me alone."

In the same time period, a number of Safety Plus customers received calls in which

---

1. Zee was a much larger company than Safety Plus, and this thirty-mile radius represented only a small portion of Zee's overall sales territory.

a man indicated that the customer owed money to Safety Plus. For instance, Albert Cohn, the owner of a steel company, called Jones on March 13, 1989, to ask why Jones had reported his company to a collection agency. It turned out that Cohn had received a call from a man who purported to represent a collection agency and who claimed that Cohn's company had failed to pay its Safety Plus bill. At the time, Cohn's company did not owe Safety Plus any money and was not even a Safety Plus customer. Jones assured Cohn that Safety Plus had not reported his company to a collection agency, and Jones told Cohn that a number of his customers had been complaining of similar calls. Cohn received a call from the same man a week later, and the man again purported to represent a collection agency. Cohn recognized the man's voice as that of the Zee salesman who previously had called on his company.

Also on March 13, 1989, Marlene Migliorini, a lumber company manager, called Jones to ask why he had reported the lumber company to the Dunn & Bradstreet collections department. Jones assured Migliorini that he had not and that the lumber company owed Safety Plus no money. Yet Migliorini received a second call after talking to Jones, again from a man purporting to be a Dunn & Bradstreet employee. This time, the man told Migliorini that the company's credit rating had been damaged by its outstanding debts to Safety Plus. Migliorini called Jones a second time, and he again assured her that Safety Plus had not reported the lumber company to Dunn & Bradstreet. During the same time period, Migliorini received at least three visits from a Zee salesman. When Migliorini told the man that her company purchased its medical supplies from Safety Plus, he asked her to reconsider because Safety Plus was having financial difficulties and would soon go out of business. During the man's next visit, after Migliorini again stressed her intention to remain with Safety Plus, the salesman became quite upset. Migliorini eventually placed a sign on the lumber company's medicine cabinet indicating

that Zee should not restock the cabinet and that the lumber company would not pay if it did.

On March 23, 1989, the harasser apparently decided to try a different tactic. On that date, flowers were delivered to one of Safety Plus' female employees. The attached card indicated they had been sent by Jones, yet Jones explained at trial that he had sent no flowers. On the same day, Domino's Pizza called Jones to inform him that it would be delivering the pizza he had ordered but that he should order from a different Domino's location in the future. Jones testified that he had not ordered a pizza. Finally, Lucenta Tire Company called with a question about the four tires Jones had ordered C.O.D. Again, Jones told the jury that he had not ordered any tires. After this final call, Jones reported the harassment to the police.[2]

The following day, Jones' wife received a threatening telephone call at home. The caller told Jones' wife that her husband owed him a lot of money, and when she asked the caller to identify himself, the man told her, "I know where you live and I'm going to come and blow your head off." Jones' wife could not identify the man's voice.

Telephone records for March 1989, which the government produced at trial, showed that calls from a pay telephone to Cohn's steel company and to Migliorini's lumber company on March 13, 1989, had been billed to Canoy's home telephone number. The records also showed that on March 23, 1989, calls from a pay telephone to Lucenta Tires, a flower shop, and to Domino's Pizza had been billed to the same number. The records, however, did not reflect any calls to Kemmerer's bottling plant on March 28, yet they showed a call billed to Canoy's home telephone number that had been placed from a pay telephone at 2:49 p.m. on that date, suggesting that Canoy had been at a pay telephone near the time that the threatening call had been made to the Kemmerer plant.

Canoy testified in his own defense at trial. He admitted placing the harassing telephone

---

**2.** Jones eventually closed Safety Plus in March 1990 because of all the negative publicity the company received as a result of the Tylenol incident and the other harassing telephone calls. He then started a new company under a different name.

calls to Safety Plus' present or potential customers, and he also admitted ordering the flowers, pizza, and tires. He explained that he had done these things merely to annoy a competitor, that he believed it had been the right thing to do, and that it was simply the nature of the business. Yet Canoy denied making the cyanide threat to the Kemmerer bottling plant. The jury apparently found this denial not credible and convicted Canoy of violating 18 U.S.C. § 1365(c).[3] The district court eventually sentenced Canoy to 27 months in prison.

## II. DISCUSSION

### A. Challenges to Conviction

#### 1.

■ Canoy's first and most substantial challenge to his conviction relates to the government's use of a peremptory strike during jury selection to excuse Daniel Ma, a man of Asian descent. Canoy was born and spent most of his life in the Philippines, arriving in the United States in 1985. He maintains that the government engaged in purposeful discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when it struck the only individual on the venire who was of Asian descent.

The Supreme Court held in *Batson* that the Equal Protection Clause of the Fourteenth Amendment grants to defendants "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria" and that it therefore prohibits purposeful racial discrimination in the use of peremptory challenges. 476 U.S. at 85–86, 106 S.Ct. at 1717; *see also United States v. Ferguson*, 935 F.2d 862, 864 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d 807 (1992).[4] *Batson* applies to fed-

eral criminal prosecutions through the Fifth Amendment's Due Process Clause. *United States v. Chandler*, 12 F.3d 1427, 1430 (7th Cir.1994); *United States v. Williams*, 934 F.2d 847, 849 n. 1 (7th Cir.1991). In *Batson* and later cases, the Supreme Court has developed the following framework for evaluating claims of discrimination in the use of peremptory challenges:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991); *see also United States v. Cooper*, 19 F.3d 1154, 1158 (7th Cir.1994); *United States v. Marin*, 7 F.3d 679, 685 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994); *cf. J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, —— – ——, 114 S.Ct. 1419, 1429–30, 128 L.Ed.2d 89 (1994) (applying same framework to evaluation of peremptory strikes that give rise to charge of gender discrimination).

Here, the government does not dispute that Canoy made a prima facie showing of purposeful race discrimination. He has shown:

> (1) that he is a member of a cognizable racial group;

> (2) that the government used a peremptory challenge to remove from the venire a member of a cognizable racial group; and

---

**3.** That statute provides:

(c)(1) Whoever knowingly communicates false information that a consumer product has been tainted, if such product or the results of such communication affect interstate or foreign commerce, and if such tainting, had it occurred, would create a risk of death or bodily injury to another person, shall be fined not more than $25,000 or imprisoned not more than five years, or both.

(2) As used in paragraph (1) of this subsection, the term "communicates false information" means communicates information that is false and that the communicator knows is false, under circumstances in which the information may reasonably be expected to be believed.

**4.** The Supreme Court recently extended *Batson* to the exercise of peremptory challenges that are the result of intentional gender discrimination. *See J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

(3) that the facts and any other relevant circumstances raise an inference that the opposing party used the peremptory challenge to exclude the venireperson on account of that person's race.

*Cooper,* 19 F.3d at 1159; *see also Batson,* 476 U.S. at 96, 106 S.Ct. at 1723; *Ferguson,* 935 F.3d at 864. Our focus is therefore on the government's articulated explanation for striking Ma.

■■■ The government's burden once the defendant has made a prima facie showing is to articulate a race-neutral explanation for its action. *Hernandez,* 500 U.S. at 358–59, 111 S.Ct. at 1866; *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723–24. The government does not meet that burden merely by assuring the district court that it lacked a discriminatory motive and that it exercised the challenge in good faith. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1723–24. The government must instead come forward with a race-neutral explanation that is "clear and reasonably specific" and that is related to the particular case at hand, although the explanation "need not rise to the level justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97–98 & n. 20, 106 S.Ct. at 1723–24 & n. 20; *Ferguson,* 935 F.2d at 864. A race-neutral explanation is one "based on something other than the race of the juror," and unless a discriminatory intent is inherent in the government's explanation, the reason will be deemed race-neutral. *Hernandez,* 500 U.S. at 358–59, 111 S.Ct. at 1866; *Marin,* 7 F.3d at 686. Yet a race-neutral explanation that is "an obvious mask for a race-based challenge" will not rebut the defendant's prima facie case of discrimination. *Dunham v. Frank's Nursery & Crafts, Inc.,* 967 F.2d 1121, 1124 (7th Cir.

1992); *Splunge v. Clark,* 960 F.2d 705, 709 (7th Cir.1992).

We agree with the district court that the government offered a facially-neutral explanation for its challenge here. The government explained that it had not challenged Ma when choosing the regular jury, but only when Ma had been one of four possible alternate jurors.[5] The government viewed Ma as the least desirable of the four and used its only strike to excuse him. It explained to the district court that because Ma had been educated outside the United States and entirely in a foreign language, the government was concerned with whether English was Ma's first language. (Tr. at 103, 105.) The three remaining alternates had all been educated in the United States, which the government viewed as preferable in a case in which what Canoy may have said over the telephone and to investigating FBI agents was at issue. (*Id.* at 103.) The district court accepted this explanation, finding that the government had not utilized Ma's ethnic background or race as a selection criteria. (*Id.* at 106.) The court was particularly influenced by the fact that the government had not challenged Ma in selecting the regular jury, although it had left two strikes unused. The court also found it "plausible" that Ma had been the least desirable alternate to the government because he had been educated entirely in a foreign country and in a foreign language, although the court also noted that Ma had not exhibited any difficulty speaking or understanding English when questioned by the court. (*Id.* at 105.) On the basis of these findings, the court allowed the govern-

**5.** An understanding of the district court's jury selection procedure is helpful to placing Canoy's *Batson* challenge as well as the government's race-neutral explanation in proper perspective. The district court first seated three successive panels of fourteen jurors and questioned the members of each panel. Overall, forty-two venirepersons were questioned. All three panels were then tendered to the parties at one time, and the district court permitted Canoy ten peremptory strikes and the government six. The district court had previously explained that the first twelve unchallenged jurors would comprise the regular jury. The court then utilized the same procedure to select two alternate jurors, with each party permitted one additional peremptory strike. Ma was the last member of the second panel of fourteen venirepersons, or the twenty-eighth juror overall. When the three panels were tendered to the parties for selection of the regular jury, the government exercised four of its six strikes but did not strike Ma. Canoy used all ten of his peremptory strikes. Because one juror had been excused for cause and fourteen others through peremptory strikes, Ma was not seated on the regular jury but was the first of four possible alternates. The government used its additional peremptory strike in the alternate-selection phase to strike Ma.

ment's challenge to stand.[6]

▮ The district court's finding that the government did not purposefully discriminate was necessarily fact-based. That finding may therefore not be reversed unless we find it clearly erroneous. *Cooper*, 19 F.3d at 1160; *Marin*, 7 F.3d at 686. The Supreme Court has emphasized that such a finding turns to a significant extent on the lower court's assessment of the prosecutor's credibility. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. In *Hernandez*, the Court explained:

> [i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

6. In denying Canoy's post-trial motion, the district court reiterated its belief that the government's explanation had been truthful. (Aug. 25, 1993 Tr. at 4–5.)

We also note for the sake of completeness that neither of the two alternate jurors selected in place of Ma actually deliberated on the verdict, leading the government to argue that Canoy suffered no prejudice. There is some authority for the proposition that a *Batson* error relating to an alternate juror may be harmless where no alternate actually deliberates on the verdict. *See United States v. Lane*, 866 F.2d 103, 106 n. 3 (4th Cir.1989); *Nevius v. Sumner*, 852 F.2d 463, 468 (9th Cir.1988), *cert. denied*, 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989); *Roberts v. Singletary*, 794 F.Supp. 1106, 1125 (S.D.Fla. 1992), *aff'd*, 29 F.3d 1474 (11th Cir.1994). Yet the government did not whole-heartedly embrace such a rule when we raised the issue at oral argument. We need not take a position today, however, as we decide below that the government did not engage in purposeful race discrimination in any event. But we note that a harmless error rule may conflict with the Supreme Court's recent pronouncements in this area. For example, in *Powers v. Ohio*, 499 U.S. 400, 411, 111 S.Ct. 1364, 1371, 113 L.Ed.2d 411 (1991), the Court explained that:

> A prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a constitutional violation committed in open court at

500 U.S. at 365, 111 S.Ct. at 1869 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985)); *see also Cooper*, 19 F.3d at 1161–62 ("[t]he trial judge sits in the unique position to make credibility assessments of the actions of trial attorneys."); *Williams*, 934 F.2d at 849. Indeed, " '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous,' " even if we may think the choice a dubious one. *Hernandez*, 500 U.S. at 369, 111 S.Ct. at 1871–72 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)); *see also Dunham*, 967 F.2d at 1124; *Williams v. Chrans*, 957 F.2d 487, 490 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). The district court's conclusion below was not clearly erroneous, as we are not left with the " 'definite and firm conviction that a mistake has been committed.' " *Hernandez*, 500 U.S. at 370, 111 S.Ct. at 1872 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

> the outset of the proceedings. The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause. The *voir dire* phase of the trial represents the jurors' first introduction to the substantive factual and legal issues in a case. The influence of the *voir dire* process may persist through the whole course of the trial proceedings.

(internal quotation omitted). *Powers* also observed that "racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt" and that the unconstitutional selection procedure "may pervade all the proceedings that follow." *Powers*, 499 U.S. at 412–13, 111 S.Ct. at 1371–72; *see also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 629, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991). *Powers* could thus be read to suggest that a *Batson* error may at times irreparably infect the entire trial so that its prejudicial impact would not be limited by the fact that no alternate juror actually deliberated on the verdict. We express no opinion today, however, on whether that is a proper reading of *Powers*. *Cf. Rosa v. Peters*, 36 F.3d 625, 634 n. 17 (7th Cir.1994) ("While jury selection is associated with a trial, we do not believe that the Supreme Court would deem a *Batson* violation a 'constitutional error of the trial type' so that we would apply the harmless error standard....").

We have in the past upheld as race-neutral peremptory challenges based on the failure to attain a certain educational level. *See Marin,* 7 F.3d at 686–87; *United States v. Tucker,* 773 F.2d 136, 142 (7th Cir.1985) (holding, pre-*Batson,* that challenge to African–Americans who had limited education was race-neutral), *cert. denied,* 478 U.S. 1021, 1022, 106 S.Ct. 3337, 3338, 92 L.Ed.2d 742 (1986). The fact that a juror was educated outside the United States and entirely in a foreign language also is race-neutral on its face, although that explanation has a greater than average potential to mask racial or national origin discrimination. *See Hernandez,* 500 U.S. at 360, 111 S.Ct. at 1867 (challenge to bilingual jurors on the ground that they may not follow the interpreter's translation of testimony in the juror's second language is race-neutral). The criterion used by the government here could certainly have a disparate impact on prospective jurors who are members of racial or ethnic minorities, as such jurors are more likely to have been educated outside the United States in a language other than English. A court presented with such an explanation should thus consider it with care to ensure that the government's language-based concerns are warranted and are not merely a pretext for racial or national origin discrimination. *See Pemberthy v. Beyer,* 19 F.3d 857, 869 (3d Cir.1994) ("Because language-speaking ability is so closely correlated with ethnicity, a trial court must *carefully* assess the challenger's actual motivation even where the challenger asserts a rational reason to discriminate based on language skills." (emphasis in original)), *cert. denied,* —— U.S. ——, 115 S.Ct. 439, 130 L.Ed.2d 350 (1994).

Of course, the Supreme Court has reminded us that the potential for a disparate impact does not prove purposeful discrimination per se, as the effect of such a criterion "does not alone show its purpose." *Hernandez,* 500 U.S. at 362, 111 S.Ct. at 1867; *see also Chrans,* 957 F.2d at 490; *Pemberthy,* 19 F.3d at 869. Rather, it is up to the district court, which has had the opportunity to view the challenged juror and to hear the government's explanation, to assess whether the government is legitimately concerned about language skills or is instead utilizing that concern as a shield for prohibited discrimina-

tion. Here, the circumstances of Ma's education made him, in the government's view, the least desirable of four possible alternate jurors. The district court found the government's explanation plausible, and we cannot on this record dismiss that finding as clearly erroneous.

Canoy challenges the district court's credibility assessment on the ground that the government did not strike non-Asian jurors who, unlike Ma, had not received a secondary education. Yet the government's articulated concern was not with the level of education a juror had attained, but with whether the juror had been educated in a language other than English. The non-Asian jurors without college degrees all had been educated in this country, and the fact that the government accepted them does not render implausible its explanation for striking Ma. Moreover, the only other member of the venire educated outside the United States was a woman who had attended school in England. The government's failure to strike this woman casts no doubt on its articulated reason for striking Ma.

The district court also was influenced by the fact that the government had not initially challenged Ma in selecting the regular jury, although it had left two strikes unused. (Trial Tr. at 103, 105; Aug. 25, 1993 Tr. at 4–5.) A number of circuits, including this one, have relied on the fact that the government waived available strikes and permitted members of a racial minority to be seated on a jury to support a finding that the government did not act with discriminatory intent in striking another member of the same minority group. *See United States v. Nichols,* 937 F.2d 1257, 1264 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992); *United States v. Briscoe,* 896 F.2d 1476, 1489 (7th Cir.1990), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990); *see also, e.g., United States v. Alvarado,* 951 F.2d 22, 26 (2d Cir. 1991); *United States v. Walton,* 908 F.2d 1289, 1298 (6th Cir.), *cert. denied,* 498 U.S. 906, 989, 990, 111 S.Ct. 273, 530, 532, 112 L.Ed.2d 229, 541, 542 (1990); *United States v. Lane,* 866 F.2d 103, 107 (4th Cir.1989); *United States v. Montgomery,* 819 F.2d 847,

851 (8th Cir.1987); *United States v. Dennis,* 804 F.2d 1208, 1211 (11th Cir.1986), *cert. denied,* 481 U.S. 1037, 107 S.Ct. 1973, 1974, 95 L.Ed.2d 814 (1987). We think the same principle should apply where the government failed to challenge an individual who was tendered for, but not placed on, the regular jury and who was later challenged during the selection of alternates.

Yet Canoy maintains that the government's non-use of two peremptory strikes in selecting the regular jury actually *supports* his *Batson* claim because it had the effect of eliminating Ma as a regular juror (Ma was the twenty-eighth juror overall; one juror was excused for cause and the parties utilized fourteen peremptory strikes, meaning that only the first twenty-seven jurors had a chance of being seated on the regular jury). Indeed, Canoy maintains that the government's failure to use its two additional strikes was part of its strategy to exclude Ma from the regular jury. We find this scenario rather unlikely, and we certainly do not read *Batson* to impose a duty on the government to utilize all of its peremptory strikes in order to ensure that members of a racial minority are seated on a jury. We also hesitate to discount the district court's reliance on the government's failure to initially strike Ma in finding that the government had not purposefully discriminated when Canoy never argued to the district court that the government's non-use of its remaining peremptory strikes actually *evidenced* its discriminatory intent. *See Chandler,* 12 F.3d at 1431–32 (counsel must clearly inform the district court why the government's explanation is inadequate to enable the district court to make an informed ruling). Had Canoy made that argument, the district court could then have considered whether to accord any weight to the government's failure to strike Ma during selection of the regular jury in ruling on Canoy's *Batson* objection.

For all of these reasons, then, this record does not leave us with the definite and firm conviction that the district court erred in finding no purposeful discrimination in the government's challenge to Daniel Ma.

2.

■ Canoy next contends that he was denied due process when the government delayed his indictment until almost four years after the threatening telephone call and three years after he allegedly had confessed to FBI agents. He argues that the government's delay prevented him from obtaining exculpatory telephone records because Illinois Bell, in the regular course of its business, destroys all telephone records after a period of eighteen months. Canoy maintains that absent the prosecutorial delay, he would have subpoenaed the telephone records of other persons who may have been responsible for other harassing telephone calls and used those records to convince the jury that someone else had made the threatening call here.

■ A defendant's primary safeguard against prosecutorial delay lies in the applicable statute of limitations, yet the Fifth Amendment's Due Process Clause "also plays a limited role in protecting defendants from oppressive delay." *United States v. Windom,* 19 F.3d 1190, 1195 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *see also Wilson v. McCaughtry,* 994 F.2d 1228, 1233 (7th Cir. 1993); *United States v. Anagnostou,* 974 F.2d 939, 941 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993). As a number of our recent cases have explained, this circuit has developed two divergent standards for evaluating due process claims premised on pre-indictment delay. *See, e.g., Windom,* 19 F.3d at 1195; *Wilson,* 994 F.2d at 1233; *Pharm v. Hatcher,* 984 F.2d 783, 786 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 125, 126 L.Ed.2d 89 (1993); *United States v. Koller,* 956 F.2d 1408, 1415 (7th Cir.1992). Both standards require a defendant to show that the delay caused him "actual and substantial prejudice," yet under one line of cases, the burden then shifts to the government to explain the necessity for the delay, with the court then balancing the prejudice to the defendant against the reasons for delay in determining whether the defendant has been deprived of due process. *See Windom,* 19 F.3d at 1195; *Pharm,* 984 F.2d at 786; *Koller,* 956 F.2d at

1415; *United States v. Solomon*, 688 F.2d 1171, 1179 (7th Cir.1982). Under our other line of cases, however, it is the defendant's burden to show in addition to actual and substantial prejudice that "the government delayed the indictment for tactical advantage or some other impermissible reason." *Anagnostou*, 974 F.2d at 941; *Koller*, 956 F.2d at 1415; *see also United States v. Van Engel*, 15 F.3d 623, 630 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994).

Although we have consistently noted the differing standards applied in our cases, we only recently had occasion to resolve the conflict. In *United States v. Sowa*, 34 F.3d 447, 450–52 (7th Cir.1994), we finally encountered a case where the defendant was able to establish "actual and substantial prejudice" from a pre-indictment delay. Our resolution of the defendant's claim thus depended on the second step in our due process analysis. Referencing the competing standards that had developed in our cases, we concluded that "once the defendant has proven actual and substantial prejudice, the government must come forward and provide its reasons for the delay. The reasons are then balanced against the defendant's prejudice to determine whether the defendant has been denied due process." *Id.* at 451. We explained that this procedure is compelled both by Supreme Court precedent and by simple logic because "once the defendant has cleared the monumental hurdle of proving prejudice," he would have no way of establishing the reason for the delay unless the government was required to come forward with its explanation. *Id.* at 451. We need not reach the second step in the analysis here in any event, as Canoy has failed to satisfy the prejudice prong.

■ The defendant's obligation to show actual and substantial prejudice is an exacting one. *Anagnostou* observes that "it is not enough ... to offer some suggestion of speculative harm; rather, the defendant must present concrete evidence showing material harm." 974 F.2d at 942; *see also Van Engel*, 15 F.3d at 630; *Wilson*, 994 F.2d at 1234; *Nichols*, 937 F.2d at 1261. Other cases explain that the defendant's " 'allegations of

prejudice must be specific, concrete and supported by the evidence—vague, speculative, or conclusory allegations will not suffice.' " *Koller*, 956 F.2d at 1415 (quoting *United States v. Fuesting*, 845 F.2d 664, 669 (7th Cir.1988)); *see also Pharm*, 984 F.2d at 787. Regardless of the formulation, it is clear that the prejudice must be concrete and substantial; a defendant is not deprived of due process if he is only "somewhat prejudiced by the lapse of time." *United States v. Lovasco*, 431 U.S. 783, 796, 97 S.Ct. 2044, 2052, 52 L.Ed.2d 752 (1977); *see also Van Engel*, 15 F.3d at 630. Canoy's allegations of prejudice here fall short of these exacting requirements.

Canoy's contention is that the pre-indictment delay prevented him from subpoenaing telephone records of other individuals who may also have been harassing Safety Plus, Jones, and/or his wife because the records had been destroyed after eighteen months. Canoy is confident that these telephone records would have implicated others in the alleged harassment and would have permitted him to argue to the jury that one of the other harassers had made the threatening call to the Kemmerer plant. But Canoy's allegations are even more speculative than those suggesting that prosecutorial delay caused a witness who would have provided testimony helpful to the defense to become unavailable. For example, we have consistently rejected vague allegations of prejudice even where a defense witness died during the period of pre-indictment delay. *See, e.g., Pharm*, 984 F.2d at 787; *Anagnostou*, 974 F.2d at 942; *United States v. Adams*, 834 F.2d 632, 634 (7th Cir.1987), *cert. denied*, 484 U.S. 1046, 108 S.Ct. 783, 98 L.Ed.2d 869 (1988). In that circumstance, we have required proof that the missing witness would have testified on the defendant's behalf, would have withstood cross-examination, and would have been a credible witness before the jury. *Pharm*, 984 F.2d at 787; *United States v. Doerr*, 886 F.2d 944, 964 (7th Cir. 1989). In the same vein, it is insufficient merely to assert that certain records became unavailable without a more specific showing of whose records would have been subpoenaed, what those records are likely to have shown, and how the records would have been

helpful to the defense—*e.g.*, here, how the records would have implicated another individual in the call to the Kemmerer plant. Any prejudice to Canoy is therefore merely speculative rather than actual and substantial.[7]

Although we need not address the government's reasons for the delay in light of our finding that Canoy was not actually and substantially prejudiced by it, we note that there is no evidence indicating that the government delayed the indictment in bad faith in order to gain a tactical advantage. The government explains instead, and without contradiction from Canoy, that the delay resulted from its investigatory process, grand jury proceedings, an exchange between the parties of discovery materials, and then by lengthy pre-indictment plea negotiations before Canoy finally decided not to enter a plea. Thus, even if Canoy had shown actual and substantial prejudice from the delay, we would not find a violation of due process.

Canoy has raised two other challenges to his conviction that do not require discussion here. We have considered each of those arguments and find that neither would support a reversal of Canoy's conviction. The conviction is accordingly affirmed.

### B. Sentencing

#### 1.

 Canoy also asks that we review the refusal below to grant a downward departure from the applicable Sentencing Guidelines range on the basis of extraordinary family circumstances. The district court initially sentenced Canoy on August 25, 1993, and it determined to depart downward from the 27 to 33 month range on the basis of Canoy's extraordinary family circumstances. The court found that Canoy is a good father, that he has three exemplary children, and that his family would suffer "substantially" and perhaps "irreparably" were he incarcerated for a full 27 months. (Aug. 25, 1993 Tr. at 41–42.)

The court thus departed downward pursuant to U.S.S.G. § 5H1.6 and sentenced Canoy to 18 months in prison. A week later, the government asked the court to reconsider its departure, arguing that the court had provided no prior notice of its intention to depart and that the departure was foreclosed by our decision in *United States v. Thomas*, 930 F.2d 526 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991) ("*Thomas I*"). Although the district court expressed its displeasure with *Thomas I* and indicated that absent our decision there, it would have reimposed the 18 month sentence, the court read *Thomas I* to prohibit departures based on family circumstances even in an extraordinary case. The district court therefore imposed a sentence of 27 months, the lowest possible under the Guidelines range.

The government concedes that we have jurisdiction to review Canoy's challenge to his sentence, as the district court believed it lacked authority to depart on the basis of extraordinary family circumstances in light of *Thomas I*. *See United States v. Poff*, 926 F.2d 588, 590–91 (7th Cir.1991) (en banc) (refusal to depart downward reviewable on appeal if district judge believed it lacked legal authority to depart), *cert. denied*, —— U.S. ——, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991); *see also United States v. Atkinson*, 15 F.3d 715, 718 n. 2 (7th Cir.1994); *United States v. Upthegrove*, 974 F.2d 55, 56 (7th Cir.1992). The court indicated on reconsideration that the existing 18 month sentence was most suited to the circumstances but that *Thomas I* deprived the court of the legal authority to impose a sentence below the applicable Guidelines range. *See* Govt.Br. at 35–36 n. 8 ("The district court's comments at the time of resentencing reflect the district court's belief that it did not have the authority to depart, given the holding of *Thomas [I]*."). In this appeal, Canoy asks that we reconsider *Thomas I* and interpret U.S.S.G.

---

7. We note as well that Canoy was on notice within the eighteen-month period before Illinois Bell would have destroyed the relevant telephone records that he was suspected of making the call to Kemmerer. The company received the threatening telephone call on March 28, 1989, and Canoy was questioned by FBI agents about that

call on January 5, 1990. Indeed, one of the agents testified at trial that Canoy admitted on that date that he had made the threatening telephone call. Yet Canoy made no attempt at that time to obtain from Illinois Bell the telephone records that allegedly would have helped to exonerate him.

§ 5H1.6 to permit departures from a sentencing range to account for extraordinary family circumstances. We have jurisdiction to consider Canoy's argument. *See Atkinson,* 15 F.3d at 718 n. 2; *Poff,* 926 F.2d at 590–91; *cf. United States v. Thomas,* 11 F.3d 732, 735–36 (7th Cir.1993) ("*Thomas II* ") (no jurisdiction to review district court's discretionary decision not to consider family circumstances in departing downward on another ground), *cert. denied,* —— U.S. ——, 115 S.Ct. 419, 130 L.Ed.2d 334 (1994).

In *Thomas I,* we addressed whether the district court could consider a defendant's extraordinary family circumstances in departing downward from a ten-year mandatory minimum sentence. *See* 21 U.S.C. § 841(b)(1)(A). After the government had made a motion for a downward departure pursuant to 18 U.S.C. § 3553(e) [8] to account for Thomas' substantial assistance to the government, the district court, citing the fact that Thomas alone was responsible for three mentally disabled, adult children, two of whom lived with her at the time, and was also the legal guardian of a four-year-old grandson, imposed a sentence of probation. In reviewing that sentence, *Thomas I* resolved a number of issues under the Guidelines, and it is important that we distinguish between them here. The *Thomas I* panel first held that a sentence of probation was forbidden by section 841(b)(1)(A), the statute imposing the ten-year mandatory minimum sentence, because that statute also provides that "[n]otwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person sentenced under this subparagraph." 930 F.2d at 528. Although the probationary sentence imposed by the district court was therefore erroneous on this ground, the court then addressed the appropriateness on remand of considering Thomas' extraordinary family circumstances in determining the extent of any departure from the ten-year mandatory

minimum sentence. On that score, *Thomas I* held that district courts departing from mandatory minimum sentences pursuant to section 3553(e) may only consider the quality of the assistance rendered by the defendant to the government. *Id.* at 529, 530; *see also* U.S.S.G. § 5K1.1. The district court therefore also erred in factoring Thomas' family circumstances into its departure equation.

Having reached that conclusion, the panel proceeded to consider Thomas' argument that Guidelines section 5H1.6 authorized the district court to consider her extraordinary family circumstances. At the time of our decision in *Thomas I,* section 5H1.6 provided:

Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the guidelines. Family responsibilities that are complied with are relevant in determining whether to impose restitution and fines. Where the guidelines provide probation as an option, these factors may be relevant in this determination. If a defendant is sentenced to probation or supervised release, family ties and responsibilities that are met may be relevant in the determination of the length and conditions of supervision.

Despite the Sentencing Commission's use of the word "ordinarily" in the first sentence of section 5H1.6, the *Thomas I* panel concluded that even extraordinary family circumstances would not provide a basis for departure from an imprisonment range. 930 F.2d at 530 ("Section 5H1.6 contains no suggestion that departures may be based on family considerations whenever they strike judges as particularly compelling."). Instead, family considerations are only relevant, *Thomas I* held, to the imposition of restitution or a fine, or to the length and conditions of probation and supervised release, where those sentencing options are available. *Id.* The court concluded that "the Commission's affirmative statement that family responsibilities are rel-

---

8. That statute provides:

 **(e) Limited authority to impose a sentence below a statutory minimum**—Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assis-

tance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

evant when probation is an option suggests that the Commission did not intend them to be relevant when, as here, probation is *not* a sentencing option." *Id.* (emphasis in original).

By the time Mattie Lou Thomas was resentenced on remand, however, the Commission had amended section 5H1.6 in several significant respects:

> Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.

> Family responsibilities that are complied with may be relevant to the determination of the amount of restitution or fine.

(Eff. Nov. 1, 1991). We observed in *Thomas II* that although this amendment had not disturbed *Thomas I*'s primary holding that "only factors relating to a defendant's assistance to the government should affect the extent of a departure from a statutory minimum sentence," it "may affect the second of *Thomas I*'s alternative bases of decision"— that departures accounting for extraordinary family circumstances are forbidden by section 5H1.6 even in the absence of a statutory minimum. 11 F.3d at 736. *Thomas II* reasoned that this alternative holding had been based "on language that has since been excised from § 5H1.6." *Id.* at 736 n. 1. We had no occasion to definitively resolve this issue in *Thomas II*, however, because, as we have explained, that case involved a mandatory minimum sentence, and we had held in *Thomas I* that only substantial assistance, and not extraordinary family circumstances, may provide a basis for departure from such a statutory minimum. We reaffirmed this holding in *Thomas II*, and indeed, it has been embraced by a number of our sister circuits. *See United States v. DeMaio*, 28 F.3d 588, 591 (7th Cir.1994) ("We made explicit in *Thomas II*, that once the government files a motion pursuant to 18 U.S.C. § 3553(e), the court may not depart below the mandatory minimum sentence on any other ground except the defendant's substantial assistance to the authorities."); *Thomas II*, 11 F.3d at 736–37; *see also United States v. Campbell*, 995 F.2d 173, 175 (10th Cir.1993); *United States v. Chestna*, 962 F.2d 103, 106 (1st Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 334, 121 L.Ed.2d 251 (1992); *United States v. Valente*, 961 F.2d 133, 135 (9th Cir.1992); *United States v. Snelling*, 961 F.2d 93, 97 (6th Cir.1991). We stand by that portion of *Thomas I* today.

Yet Canoy's sentence is based only on a Guidelines range and not a statutory minimum. Thus, *Thomas I*'s holding that even extraordinary family circumstances would not provide a basis for departure from a statutory minimum does not apply here. Instead, the district court found itself without authority to depart due to *Thomas I*'s alternative holding—that section 5H1.6 does not authorize departures from a sentencing range to account for family circumstances even in an extraordinary case. *See* 930 F.2d at 530.[9] As we explained above, however, *Thomas II* questioned the continued viability of that holding in light of the November 1, 1991 amendment to section 5H1.6. *See* 11 F.3d at 736. Canoy asks that we follow *Thomas II*'s lead and definitively reject *Thomas I*'s alternative holding today. We find his argument persuasive.

The government insisted at oral argument that the other circuits agree with *Thomas I* that even extraordinary family circumstances may *never* provide a basis for departure from a sentencing range. Yet each of the cases referenced by the government involved a departure from a statutory minimum (*see supra*, at 905), and as we explained in *Thomas II*, "different rules apply to the[se] two types of departures." 11 F.3d at 736. In fact, apart from the decisions referenced by the panel in *Thomas I* (930 F.2d at 529),[10] we have been unable to locate a single decision from another circuit that is consistent with

---

9. We note initially that this portion of *Thomas I* was arguably dicta because it was unnecessary to the court's primary conclusion that substantial assistance to the government provides the only basis for departure from a statutory minimum sentence pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. 930 F.2d at 529.

10. As the following list of authorities indicates, later decisions of the Fourth, Eighth, and Ninth Circuits hold that extraordinary family circumstances may provide a basis for departure. (*See infra,* at 906.)

*Thomas I*'s alternative holding that even extraordinary family circumstances may never provide a basis for departure from an imprisonment range. Instead, the other circuits are unanimous in finding that section 5H1.6 permits departures from an imprisonment range to account for family circumstances in an extraordinary case. *See, e.g., United States v. Rivera,* 994 F.2d 942, 948, 953 (1st Cir.1993) (Breyer, C.J.) ("district courts have authority to depart in 'unusual cases' and where family circumstances are out of the 'ordinary.'"); *United States v. Johnson,* 964 F.2d 124, 129 (2d Cir.1992) ("Extraordinary family circumstances are widely accepted as a valid reason for departure."); *United States v. Sharpsteen,* 913 F.2d 59, 63 (2d Cir.1990) ("The clear implication of section 5H1.6 is that if the court finds that the circumstances related to family ties and relationships are extraordinary, it is not precluded as a matter of law from taking them into account in making a downward departure."); *United States v. Monaco,* 23 F.3d 793, 801 (3d Cir.1994) ("when a 'not ordinarily relevant' factor can be characterized as 'extraordinary,' a district court has the power to depart from the guidelines."); *United States v. Gaskill,* 991 F.2d 82, 85 (3d Cir.1993) ("section 5H1.6 does not prohibit departures, but restricts them to cases where the circumstances are extraordinary."); *United States v. Bell,* 974 F.2d 537, 539 (4th Cir.1992); *United States v. Deigert,* 916 F.2d 916, 919 (4th Cir.1990) ("the Guidelines permit departure when the circumstances are extraordinary."); *United States v. Brown,* 29 F.3d 953, 961 (5th Cir.1994); *United States v. Brewer,* 899 F.2d 503, 508–09 (6th Cir.), *cert. denied,* 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990); *United States v. Haversat,* 22 F.3d 790, 797 (8th Cir.1994) ("policy statement that factor is *ordinarily* not relevant necessarily implies that the factor may be relevant in extraordinary cases" (emphasis in original)); *United States v. Simpson,* 7 F.3d 813, 819 (8th Cir.1993); *United States v. Mondello,* 927 F.2d 1463, 1470 (9th Cir.1991) ("in extraordinary circumstances, a court

may rely on one of the six factors listed in section 5H1.1–.6 to depart from the guideline range."); *United States v. Pena,* 930 F.2d 1486, 1494–95 (10th Cir.1991) ("there may be extraordinary circumstances where family ties and responsibilities may be relevant to the sentencing decision."); *United States v. Mogel,* 956 F.2d 1555, 1562 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 167, 121 L.Ed.2d 115 (1992); *see also United States v. Lopez,* 938 F.2d 1293, 1296 (D.C.Cir.1991) (although age not ordinarily relevant to a departure decision under U.S.S.G. § 5H1.1, age may be considered in an extraordinary case).[11]

Because our sister circuits have uniformly rejected *Thomas I*'s interpretation of section 5H1.6 both before and after the November 1, 1991 amendment, and because that amendment omits the language on which *Thomas I* specifically relied, we hold today that a district court may depart from an applicable guidelines range once it finds that a defendant's family ties and responsibilities or community ties are so unusual that they may be characterized as extraordinary. Any other reading would be inconsistent with the plain language of section 5H1.6 in that it would render meaningless the Commission's use of the phrase "not ordinarily relevant." If a particular factor is "not ordinarily relevant" to the district court's decision to impose a sentence "outside the applicable guideline range," then it necessarily follows that the factor may be relevant in an extraordinary case. *See Monaco,* 23 F.3d at 801; *Gaskill,* 991 F.2d at 85; *Johnson,* 964 F.2d at 129; *Pena,* 930 F.2d at 1495; *United States v. Headley,* 923 F.2d 1079, 1082 (3d Cir.1991). This reading of section 5H1.6 is consistent with the absolute prohibition on the consideration of other factors contained in Guidelines sections 5H1.10 and 5H1.12. In section 5H1.10, for instance, the Commission expressly decreed that a defendant's race, sex, national origin, creed, religion, or socio-economic status "are not relevant in the determination of a sentence." U.S.S.G. § 5H1.10. Similarly, section 5H1.12 provides that

---

11. Indeed, other courts cite our decision in *Thomas I* as the *only* example of a case where section 5H1.6 has been interpreted to forbid such departures even in an extraordinary case. *See*

*Gaskill,* 991 F.2d at 85; *Johnson,* 964 F.2d at 129; *see also Mogel,* 956 F.2d at 1561–62 (expressly disagreeing with rationale of *Thomas I* in interpreting section 5H1.6).

"[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range." U.S.S.G. § 5H1.12. Thus, when the Commission wished to prohibit district courts from considering a certain specific offender characteristic in their departure decisions, the Commission did so directly. *See Mogel,* 956 F.2d at 1562. The Commission's use of the phrase "not ordinarily relevant" in section 5H1.6, when compared to the language of these companion sections, indicates that family circumstances may provide a basis for departure in an extraordinary case. *See Johnson,* 964 F.2d at 129 ("If the Commission had intended an absolute rule that family circumstances may never be taken into account in any way, it would have said so."); *Sharpsteen,* 913 F.2d at 63. To the extent that a portion of our decision in *Thomas I* is to the contrary, it does not survive the 1991 amendment to section 5H1.6. *See Thomas II,* 11 F.3d at 736 & n. 1.[12]

### 2.

The question that remains is whether Canoy's family circumstances may be considered extraordinary. The district court thought they could, primarily because Canoy is a good father, he has three exemplary children who all are "straight-A" students, and because the district court believed that the family unit would suffer "substantially" and perhaps "irreparably" if Canoy were incarcerated for 27 months. (Aug. 25, 1993 Tr. at 41–42.) The government maintains that even if the Guidelines permit departures on the basis of extraordinary family circumstances, Canoy's circumstances here do not rise to that level. The government submits that the district court based its finding only on Canoy's extraordinary children and that we should not permit a departure on that basis.

Because until today, we have interpreted section 5H1.6 to prohibit all departures based on family considerations, we have not had occasion to consider what separates the usual and ordinary family circumstance from the truly exceptional and extraordinary. The other circuits have developed a significant body of law on this question, however. Those courts have generally indicated that the disintegration of existing family life or relationships is insufficient to warrant a departure, as that is to be expected when a family member engages in criminal activity that results in a period of incarceration. *See, e.g., Gaskill,* 991 F.2d at 85. The Second Circuit, for example, has explained that "many defendants shoulder responsibilities to their families, their employers, and their communities. Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." *Johnson,* 964 F.2d at 128; *see also Monaco,* 23 F.3d at 801 ("Because leaving children behind while in prison is a hardship common to many convicted parents, courts refuse to allow downward departures."); *Gaskill,* 991 F.2d at 85. To warrant a departure, therefore, the courts have required a showing that the period of incarceration set by the Guidelines would have an effect on the family or family members beyond the disruption to family and parental relationships that would be present in the usual case. *See, e.g., United States v. Cacho,* 951 F.2d 308, 311 (11th Cir.1992) ("Here [defendant] 'has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts ... parental relationships.'" (quoting *United States v. Daly,* 883 F.2d 313, 319 (4th Cir.1989), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2622, 110 L.Ed.2d 643 (1990))); *see also Rivera,* 994 F.2d at 954 (compiling cases where family circumstances have been found to fall short of extraordinary); *Mogel,* 956 F.2d at 1565 (same).

The line between the usual and the unusual is admittedly a fine one. Then–Chief Judge Breyer observed in *Rivera* that:

> It may not be unusual, for example, to find that a convicted drug offender is a single

---

**12.** Because we depart from a portion of *Thomas I* today, we circulated this opinion to all judges of this court in regular active service pursuant to Circuit Rule 40(f). No judge desired to rehear this case en banc.

mother with family responsibilities, but, at some point, the nature and magnitude of family responsibilities (many children? with handicaps? no money? no place for children to go?) may transform the 'ordinary' case of such circumstances into a case that is not at all ordinary.

994 F.2d at 948. The Second Circuit, for instance, has found that the family circumstances of a single mother who "was solely responsible for the upbringing of her three young children, including an infant, and the young child of her institutionalized daughter," to be extraordinary. *Johnson,* 964 F.2d at 129. Moreover, the same court affirmed a finding of extraordinary circumstances where the defendant and his wife had two young daughters and cared for the defendant's disabled father and paternal grandmother. *United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991); [13] *see also Monaco,* 23 F.3d at 801–02 (departure warranted where the defendant had suffered extreme mental anguish from having involved his son in criminal activity); *Haversat,* 22 F.3d at 797 (approving departure where the defendant was actively involved in the care of his wife, who had severe psychiatric problems, and wife's doctor had opined that wife's condition would deteriorate if she were separated from her husband); *United States v. Sclamo,* 997 F.2d 970, 973–74 (1st Cir.1993) (departure affirmed where the defendant had developed a special relationship with the young son of a woman with whom he was living; the boy had psychological and behavioral problems and his psychologist believed there would be a risk of "regression and harm if [the] defendant were incarcerated"); *Gaskill,* 991 F.2d at 84–86 (district court could depart where the defendant was the sole caretaker of his mentally ill wife, he posed no threat to the community, and the sentence called for by the Guidelines was relatively brief); *Pena,* 930 F.2d at 1494–95 (departure affirmed where the defendant was the single parent of an infant and the sole supporter of a sixteen-year-old daughter and the daughter's infant); *United States v. Big Crow,* 898 F.2d 1326, 1331–32 (8th Cir.1990) (affirming departure based on the defendant's solid family and community ties and "consistent efforts to lead a decent life in [the] difficult environment" of an Indian reservation).

■ It may well be, as the government contends, that Canoy's family circumstances are not sufficiently compelling to warrant a departure under section 5H1.6. Yet we are unwilling on the present record to rule out that possibility. We shall therefore remand to the district court for consideration of a departure in light of our discussion here. If the district court again finds that Canoy's family circumstances are extraordinary, the court should clearly explain the facts supporting its conclusion. The district court's vantage point in this regard is unique, as that court has had the benefit of seeing and hearing from Marius Canoy and the members of his family at the sentencing hearing below. Moreover, because this court reviews on appeal only the comparatively few Sentencing Guidelines cases that may present a colorable appellate issue, the district courts may have a better feel for what is or is not unusual or extraordinary. *See Rivera,* 994 F.2d at 951. Thus, when a district court clearly explains the basis for its finding of an extraordinary family circumstance, that finding is entitled to considerable respect on appeal. *See id.* at 952, 954; *Alba,* 933 F.2d at 1122 (applying abuse of discretion standard to review of district court's finding of extraordinary family circumstances); *Deigert,* 916 F.2d at 919 ("whether or not factors are extraordinary is a question of fact to which the clearly erroneous standard applies on appeal."). We thus vacate Canoy's sentence and remand for resentencing in light of this opinion.

### III. CONCLUSION

Having rejected the alleged improprieties in the trial below, we affirm Canoy's conviction. Yet because we hold that a district court may depart from an applicable sentencing range under U.S.S.G. § 5H1.6 when it finds the defendant's family circumstances to be extraordinary, we vacate Canoy's sentence and remand for resentencing.

---

**13.** The district court in *Alba* had found that the period of incarceration required by the Guidelines "might well result in the destruction of an otherwise strong family unit," and the Second Circuit concluded that this finding was not an abuse of the court's discretion. *Id.*

AFFIRMED IN PART, VACATED IN PART, AND
REMANDED.