**Martha DUNHAM and Preston Dunham, Plaintiffs-Appellants,**

v.

**FRANK'S NURSERY & CRAFTS, INCORPORATED, Defendant-Appellee.**

**No. 91–3573.**

United States Court of Appeals, Seventh Circuit.

Argued June 4, 1992.

Decided July 7, 1992.

Saul I. Ruman, Thomas A. Clements (argued), David M. Hamacher, Ruman, Clements & Tobin, Hammond, Ind., for plaintiff-appellant.

Frank J. Galvin, Robert H. Bahner (argued), Galvin, Stalmack & Kirschner, Hammond, Ind., for defendant-appellee.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and WOOD, JR., Senior Circuit Judge.

RIPPLE, Circuit Judge.

Martha Dunham was injured while shopping in Frank's Nursery & Crafts, Inc. (Frank's) in Merrillville, Indiana. She and her husband, Preston Dunham, sued Frank's and lost. In their first appeal, this court remanded the case for a hearing on whether the peremptory challenge of a black juror by Frank's was based on race.

*Dunham v. Frank's Nursery & Crafts, Inc.*, 919 F.2d 1281 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2797, 115 L.Ed.2d 970 (1990). After a hearing on remand, the magistrate judge ruled that Frank's had carried its burden of showing a neutral, non-racial, reason for its challenge. We affirm.

## I

## BACKGROUND

### A. *Facts*

The underlying facts are recited in *Dunham*, 919 F.2d at 1282. While shopping at Frank's in December 1985, Martha Dunham was injured by an electrical shock when she plugged a Christmas ornament into a portable electric outlet provided by Frank's to let its customers test ornaments before purchasing them. Mrs. Dunham brought a negligence suit against Frank's, and Mr. Dunham sued for loss of consortium and services of his wife. The Dunhams and Frank's both consented to trial before a United States Magistrate Judge. During jury selection, Frank's used only one of its peremptory challenges; the challenged juror, Essie Mitchell, was black.[1] When the Dunhams objected to the strike as racially motivated, the magistrate judge declined to require Frank's to explain the strike. At that time, neither the Supreme Court nor the Seventh Circuit had held that *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), applied in civil cases to prohibit racially-based peremptory challenges by private litigants. On appeal, this court held, as the Supreme Court later also held, *see Edmonson v. Leesville Concrete Co.*, —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), that *Batson* did indeed apply. On remand, the magistrate judge credited Frank's racially neutral explanation for the strike and held that Frank's had carried its burden under *Batson*.

---

1. A second black juror, a long-time friend of the plaintiffs, was excused for cause sua sponte by the magistrate judge.

## B.  *The District Court Proceedings*

At the *Batson* hearing, Frank Galvin, the attorney for Frank's, asserted several reasons for striking Mrs. Mitchell.  First, her occupation had caused him concern:

When this particular lady was questioned, she indicated some things that caused me concern.  And the first one of them was, and this is just kind of an old rule that I have, she indicated that she was a hairdresser.  Now, there are two reasons why being a hairdresser gave me concern.  Number one, we already had a hairdresser on the panel.  I wouldn't like two Xerox repairmen, two telephone repairmen, two lawyers, two judges.

Tr. Vol. II at 7.  Mr. Galvin stated that the presence of two jurors of the same occupation can cause problems because a professional inability to agree may result in a hung jury, or the two may "lock tight together" against the rest of the panel.  He also stated that as a general rule he did not like hairdressers on the jury: "[H]airdressers just aren't very high on my list.  Another group that's not very high on my list are waitresses and bartenders.  I feel the same way about barbers.  Depending on what they teach, I'm not particularly big on having school teachers on the jury." *Id.* at 8.  He had accepted the first hairdresser, in spite of her profession, because her husband was in law enforcement and because she was a Frank's customer.

Mr. Galvin also stated that he "put a lot of importance in the jury selection process on who the jurors are looking at during the jury selection process."  "Are they looking at me; are they looking at the Court; are they looking at my client; are they looking at plaintiff's counsel; are they looking at the plaintiff?" *Id.*  According to Mr. Galvin, Mrs. Mitchell was looking at Mrs. Dunham, and he felt her sympathies might be directed towards Mrs. Dunham.

In addition, on voir-dire Mrs. Mitchell stated that she knew two of the witnesses on the list read to the jurors by the court.  According to Mr. Galvin, "that's the type of thing where I would probably exercise one of my peremptory challenges.  It's the—because it happens so rarely, in this Federal courthouse in Hammond, Indiana, that a member of the venire knows a party or knows a witness, I'd feel more comfortable in my own mind if that person weren't sitting on the jury.  And I guess maybe that's what I feel peremptory challenges are all about." *Id.* at 12.  Other reasons for the peremptory challenge discussed during the hearing were that Mrs. Mitchell belonged to an organization or club with which Mr. Galvin was unfamiliar and that Mrs. Mitchell was self-employed and the disruption of her business might prevent her giving full attention to the trial.

The magistrate judge found that Mr. Galvin's testimony regarding his "subjective observations" of the juror, his concern about the juror's "possibly somehow knowing the Plaintiff or a friend of the Plaintiff," and "his concern for having diversity on the panel, including not having two people of the same profession," constituted a sufficient explanation, unrelated to race, for striking Mrs. Mitchell.  The magistrate judge then concluded that the plaintiffs had not carried their burden of proving purposeful discrimination.

## II

## ANALYSIS

In *United States v. Hernandez,* —— U.S. ——, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the Supreme Court set out the basic principles which must guide our review of the district court's decision.[2]  The Court reaffirmed the three-step process, outlined in *Batson,* for evaluating claims that an exercise of a peremptory challenge violated the Equal Protection Clause:

First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a

---

**2.** We note that the principal opinion upon which we rely is a plurality opinion.  However, the concurring Justices, necessary to form a majority, did not disagree on the basic methodology set forth here.  *See Hernandez,* 111 S.Ct. at 1873 (O'Connor, J., concurring).

race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. This three-step inquiry delimits our consideration of the arguments raised by petitioner.

*Hernandez,* 111 S.Ct. at 1866 (citations omitted). Although this three-step analysis was formulated in the context of criminal trials, the Court has indicated that "[t]he same approach applies in the civil context." *Edmonson v. Leesville Concrete Co.,* —— U.S. ——, 111 S.Ct. 2077, 2089, 114 L.Ed.2d 660 (1991). In the present case, there was no dispute as to the adequacy of the Dunhams' prima facie showing. Therefore, our analysis centers on steps two and three.

"In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez,* 111 S.Ct. at 1866. A neutral explanation means "an explanation based on something other than the race of the juror." *Id.* "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation." *Id.* However, a race-neutral explanation which is "an obvious mask for a race-based challenge" does not suffice to rebut a prima facie case of discrimination. *See Splunge v. Clark,* 960 F.2d 705, 709 (7th Cir.1992).

■ Once a prosecutor offers a race-neutral explanation for his exercise of a peremptory challenge, the trial court has "the duty to determine if the defendant has established purposeful discrimination." *Hernandez,* 111 S.Ct. at 1868 (quoting *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724). In *Hernandez,* the Court emphasized the factual nature of this determination: "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory

challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* 111 S.Ct. at 1869. Thus, "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985)). Therefore, the trial court's determination "represents a finding of fact of the sort accorded great deference on appeal." *Id.* 111 S.Ct. at 1868. We cannot reverse a trial court's finding that proffered, race-neutral, reasons for a strike were credible unless the court's finding is clearly erroneous—even if we find it dubious. *Williams v. Chrans,* 957 F.2d 487, 490 (7th Cir.1992); *see also United States v. Nichols,* 937 F.2d 1257, 1262 (7th Cir. 1991).

■ The striking party's explanation "need not rise to the level justifying exercise of a challenge for cause,"[3] *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, it need not be wise, *United States v. Bishop,* 959 F.2d 820, 826 (9th Cir.1992), but it must be "clear and reasonably specific" and "related to the particular case to be tried." *Batson,* 476 U.S. at 98 & n. 20, 106 S.Ct. at 1724 & n. 20; *see Nichols,* 937 F.2d at 1262. However, Frank's "may not rebut the [objecting party's] prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. The Dunhams argue that, in relying on his subjective impression that Mrs. Mitchell's sympathies were leaning toward the plaintiffs, Mr. Galvin was relying on an intuitive judgment that she would be partial to the plaintiffs because of their shared race. However, Mr. Galvin's testimony was that his

---

**3.** The plaintiffs ask us to establish a higher standard for civil *Batson* cases, "approaching that of cause" and requiring an explanation that would "show an essential difference related to the case to be tried between the juror challenged and the other jurors accepted." Appellants' Br. at 13. As the plaintiffs concede, a standard "approaching cause" would in effect do away with the peremptory challenge. To establish such a standard would contravene *Edmonson's* clear mandate that we are to apply the principles of *Batson* to civil cases.

intuitive judgment was based not on Mrs. Mitchell's race, but on her demeanor in the courtroom, on her appearing to look in Mrs. Dunham's direction, rather than at the court or at the defendant or at Mr. Galvin. This court has stated that "[a]dequate explanations for exercising a peremptory strike may include a prosecutor's 'intuitive assumptions that are not fairly quantifiable.'" *Williams v. Chrans,* 957 F.2d 487, 490 (7th Cir.1992) (quoting *United States v. Williams,* 934 F.2d 847, 850 (7th Cir.1991)); *Moore v. Keller Indus., Inc.,* 948 F.2d 199, 202 (5th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992). In the present case, Mr. Galvin's intuitive judgment was based on the juror's specific behavior and demeanor in the courtroom; it is "a neutral explanation related to the particular case to be tried." *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724; *see also Reynolds v. Benefield,* 931 F.2d 506, 512 (8th Cir.) ("body language"), *cert. denied,* — U.S. —, 111 S.Ct. 2795, 115 L.Ed.2d 969 (1991); *Moore,* 948 F.2d at 202 ("appearance during questioning" and inattentiveness); *United States v. Lance,* 853 F.2d 1177, 1181 (5th Cir.1988) ("eye contact"). The district court, which conducted and observed the voir dire as well as the later *Batson* hearing, chose to credit Mr. Galvin's testimony on this point, and the Dunhams do not advance any reasons which would lead us to conclude that this credibility determination was clearly erroneous.

The Dunhams also attack the plausibility of Mr. Galvin's explanation that he found hairdressers in general undesirable as jurors and that, as a general rule, he would not want two jurors of the same occupation. However, we conclude that the reasons Mr. Galvin gave for deciding to keep the first hairdresser in spite of his general feeling that hairdressers are not good jurors—that her husband was in law enforcement and that she was a Frank's customer—are adequate. His decision to keep her on the jury does not render incredible or implausible Mr. Galvin's statement that he prefers not to have hairdressers on the jury. *Cf. Moore,* 948 F.2d at 202 (because multiple reasons led to challenge, the existence of other jurors with some of their individual characteristics does not demonstrate that the reasons assigned were pretextual). The Dunhams also find an inconsistency in Mr. Galvin's statement that he "weighed" the two hairdressers against each other to decide which one to keep and which to exclude. Since Mr. Galvin accepted the first hairdresser before Mrs. Mitchell was called and questioned, "[c]learly, then, there was no 'weighing between the two hairdressers.'" Appellants' Br. at 17. However, in our opinion, this inconsistency does not put Mr. Galvin's credibility into such question that we can reverse the district court's determination as clearly erroneous.

The Dunhams also argue Mr. Galvin's explanation that he disliked having two jurors of the same occupation is implausible in light of the fact that he accepted two telephone company employees who are white. However, as Mr. Galvin points out, the two jurors (one of whom worked for A.T. & T. and the other for an unspecified phone company) had very different educational backgrounds and did very different work. Likewise, the Dunhams allege that Mr. Galvin excluded Mrs. Mitchell as self-employed (and hence worried about losing business and income during the trial), but did not strike other self-employed jurors. However, it is clear from the transcript of the voir-dire that, unlike the other jurors, Mrs. Mitchell hesitated perceptibly when asked if she had business or personal reasons why she "could not spend four or five days with us." Tr. Vol. II at 79 ("THE COURT: You seem to hesitate."). Indeed, her hesitation prompted further questioning from the magistrate judge on this point.

Lastly, the Dunhams attack Mr. Galvin's statement that he was uncomfortable with a juror who knew, or knew of, two[4] of the

---

4. The Dunhams' brief says one witness, but it is clear from the testimony that Mrs. Mitchell

knew, or knew of, two individuals on the witness list, Tommie and Lorenzo Cockrell:

witnesses on the list read out by the court. The Dunhams submit that Mrs. Mitchell merely indicated that she knew of the two witnesses, not that she knew them. They also point out that, in any event, those witnesses were not going to be called to testify. Therefore they argue that "this explanation hardly shows clear and reasonably specific reasons sufficient to rebut the discriminatory challenge." Appellants' Br. at 22. We disagree. It is not absolutely clear from Mrs. Mitchell's testimony whether she knew, or merely knew of, Tommie and Lorenzo Cockrell. Nonetheless, as the district court remarked, "they were listed as potential Plaintiffs' witnesses and there was at least the potential that Miss Mitchell may have been a friend of a friend of the Plaintiffs." Tr. Vol II at 53.

The decision to challenge a juror will often rest on the interplay of various factors. Here, the multiple reasons given by Frank's constitute a sufficiently clear and specific race-neutral explanation for its challenge of Mrs. Mitchell. There is no reason to reverse the district court's ultimate determination that the Dunhams failed to show purposeful racial discrimination.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

THE COURT: You do not know any of the witnesses?

Ms. MITCHELL: No. I never—not personally. I heard of their names. And I do know Tommie and Lorenzo Cockrell, but not no [sic] personal level, anything like that.

THE COURT: How do you know Tommie and Lorenzo Cockrell?

Ms. MITCHELL: He used to date one of my coworkers.

THE COURT: When you say he—

Ms. MITCHELL: That was years ago.

THE COURT: Lorenzo?

Ms. MITCHELL· Yes.

MR. CLEMENTS: Your Honor, they won't be witnesses. They are not going to be called as witnesses.

Tr. Vol. II at 84–85.