Algie CRIVENS, Petitioner–Appellant,

v.

Thomas P. ROTH, Warden, Dixon Correctional Center, Respondent–Appellee.

No. 98–1722.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1998.

Decided April 12, 1999.

Rehearing Denied April 28, 1999.

Brian D. Roche, J. Samuel Tenenbaum (argued), Lisa J. Krasberg, Henry Pietrkowski, Sachnoff & Weaver, Chicago, IL, for Petitioner–Appellant.

Domenica Osterberger (argued), Office of Attorney General, Chicago, IL, for Respondent–Appellee.

Before POSNER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

After exhausting his state remedies,[1] Algie Crivens asks this Court to release him from the Dixon Correctional Center in Dixon, Illinois, under a writ of habeas corpus, alleging that he was denied due process when the State of Illinois failed to provide him, as he requested, with the criminal records of the state's witnesses. We agree that this failure violated the law established in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and, therefore, reverse the district court's decision and order it to grant the writ.

## I. History

Crivens filed his petition for a writ of habeas corpus in 1994. In 1992, after a bench trial, the judge found Crivens guilty of first degree murder for shooting Cornelius "Corndog" Lyons in a Jewel parking lot in Chicago in 1989. In his initial motion for discovery in 1989, Crivens requested the "[p]rior criminal records of State's witnesses to be used for impeachment" as well as any pending criminal or civil actions against those witnesses involving the

State of Illinois or a subdivision of it. In response, the state answered that "[t]he People have no knowledge at this time that any of its potential witnesses have any criminal convictions." Crivens subsequently filed a "Motion for Production of Arrest Records" in which he stated that the state had not complied with his previous request for "rap sheets with respect to all state witnesses." He also requested "all records of any arrests or cases pending at the time of the arrest of [Crivens] or during the course of this case" and moved to require the state to "make specific inquiries of each of its witnesses as to any criminal convictions within the last 10 years or of any time in custody within the last 10 years." In response to this motion, the trial court ordered the state to tender "all records of any arrests or cases pending at the time of the arrest of [Crivens] or during the course of this case, of any state witnesses," as well as the rap sheets of all state witnesses and to make the specific inquiries requested by Crivens. The record does not contain a response from the state with regard to this second request, and Crivens did not pursue the matter further, assuming the lack of response indicated no such information existed.

At trial, the state presented the testimony of Julius Childs, who was a friend of Lyons and was with him when he was shot. Childs described the shooter to police as a black man with a light complexion and blond hair who was about six feet tall and weighed 140–150 pounds. At trial, he identified Crivens as the man he had seen fire the gun. The state also introduced the testimony of Odell Kelly, also a friend of Lyons, who was inside the Jewel store when he heard the shot ring out. He

---

1. The State of Illinois convicted Crivens in January 1992. The Illinois Appellate Court affirmed his conviction and sentence in June 1993 and later denied his petition for rehearing in August 1993. The Illinois Supreme Court denied his petition to appeal in December 1993. Although he did not file for post-conviction relief, we conclude that Crivens has exhausted his state remedies because Illinois' strict *res judicata* rules would almost certainly bar him from being heard on his claims, *see Gornick v. Greer*, 819 F.2d 160, 161 (7th Cir.1987), and because he can establish cause and prejudice for his failure to raise at least one of them before the Illinois courts. *See infra*, II.B.

testified to seeing Crivens running away from the scene.

As part of his defense, Crivens attempted to introduce the testimony of Titonia Smith. Crivens proffered that Smith would testify that Marcus Williams had confessed to Smith that he, and not Crivens, had shot Lyons. The court refused to hear Smith's testimony on the ground that it was unreliable hearsay. Crivens presented the remainder of his case, which included the testimony of Williams, who denied having confessed and having shot Lyons.

After submission of evidence had been concluded, the judge found Crivens guilty. In its findings, the court focused predominately on the testimony of Childs and Kelly, concluding that their testimony was credible. "I didn't hear any reason why either one of them would get on the stand and lie." The court then sentenced Crivens to twenty years imprisonment.

Crivens moved for a new trial based on a claim of newly discovered evidence. He claimed that Demetrius Taylor, who had not testified during Crivens's trial, had identified Williams as the person who shot Lyons. The state court held an evidentiary hearing based upon this information. During this hearing, Taylor testified that he saw Williams shoot Lyons and that Williams was the only person with a gun the evening of the shooting. The court denied Crivens's motion, concluding that the testimony would not change the outcome of the trial.

After exhausting his state appeals, Crivens filed a motion for a writ of habeas corpus in federal district court. He alleged that the state violated his constitutional right to due process when the trial court refused to admit Smith's testimony and grant his motion for a new trial based upon the newly discovered evidence. He also claimed that the state's suppression of Childs's criminal history violated his constitutional rights. Six years after his trial,

Crivens learned that Childs had been convicted of possessing crack cocaine with the intent to deliver it and had been sentenced to thirty months probation before Crivens's trial began. During this probation period and four months before Crivens's trial, Childs had been charged with criminal trespass to a vehicle after being arrested for driving a stolen car. Because he failed to appear in court on this second charge, a warrant was issued for his arrest. The state had not disclosed this information to Crivens upon his request or the order of the trial court. Crivens contended this failure to disclose Childs's criminal history violated the government's obligation to turn over such information as required by *Brady*.

The district court denied Crivens's petition. It concluded that Smith's testimony did not assure a level of trustworthiness that would permit the testimony to come into evidence as a declaration against interest. With regard to Taylor's testimony, the district court agreed with the state trial court, concluding that it also lacked sufficient indicia of trustworthiness. In addition, the district court noted that the state trial court heard either the offer of proof or the actual testimony of these witnesses, was able to determine credibility, and knew the substance of the evidence these individuals offered when reaching its decision. Finally, the district court found no merit to Crivens's *Brady* claim. It concluded that the criminal history was immaterial because the conviction occurred after Lyon's murder, but before Childs testified. In addition, the district court found no evidence existed that would lead it to conclude Childs would have changed his testimony as a result of the conviction or that the trial court would have looked upon Childs's record as altering his credibility. Crivens appeals this decision.

## II. Analysis

Under the habeas statute,[2] federal courts "shall entertain an application for a

---

2. Because Crivens filed his petition in 1994

and before passage of the Antiterrorism and

writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (1994). Crivens claims that the state denied him his right of due process under the Fourteenth Amendment to the United States Constitution in three respects: by failing to admit Smith's testimony; by refusing to grant his motion for a new trial based upon newly discovered evidence; and by suppressing Childs's criminal history. Because we resolve Crivens's *Brady* claim in his favor, we need not reach the merits of his other claims regarding Smith's and Taylor's testimony.

### A. Standard of Review

■ In reviewing Crivens's allegations of constitutional error in the context of a habeas petition, we apply a *de novo* standard of review. *See Milone v. Camp*, 22 F.3d 693, 698 (7th Cir.1994). However, with regard to the state court's determination of historical factual issues, we apply the presumption of correctness. *See Porter v. Gramley*, 112 F.3d 1308, 1316 (7th Cir.1997) (concluding that the presumption of correctness applies under either pre or post-AEDPA law with regard to determinations of factual issues), *cert. denied,* —— U.S. ——, 118 S.Ct. 886, 139 L.Ed.2d 873 (1998). Under this presumption, if in state court the petitioner had " 'a full and fair hearing ... resulting in reliable findings,' the federal court 'ordinarily should ... accept the facts as found' by the state tribunal." *Thompson v. Keohane*, 516 U.S. 99, 109, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (quoting *Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). Factual findings that depend upon credibility determinations should be afforded such deference. *Id.* at 111, 116 S.Ct. 457. However, we do not afford this deferential standard to mixed questions of

Effective Death Penalty Act of 1996 ("AEDPA") amended the habeas statute, we consider his arguments in light of pre-AEDPA law.

law and fact. *See Brewer v. Aiken*, 935 F.2d 850, 855 (7th Cir.1991).

### B. Procedural Default

■ Before we examine the merits of Crivens's habeas appeal, we must ensure that he exhausted his state remedies and did not procedurally default on the issues. *See Jones v. Washington*, 15 F.3d 671, 674–75 (7th Cir.1994), *overruled on other grounds by Hogan v. McBride*, 74 F.3d 144, 147 (7th Cir.1996). The district court found that Crivens had exhausted his state remedies and did not default on any of his claims. The state, however, argues that Crivens procedurally defaulted on his *Brady* claim by not first submitting it to the state courts.

■ We agree with the district court's assessment that Crivens did not procedurally default on his *Brady* claim. As a general rule, habeas petitioners must first raise their claims during state proceedings. *See id.* at 674. If they do not, they cannot proceed on those claims in federal court unless they can show cause and prejudice. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Once Crivens learned about Childs's criminal record, he could have presented it to either the state or federal court. While Crivens did not raise his *Brady* claim before the state courts, his failure resulted not from his own lack of attention or other fault, but rather because the state did not provide the information about Childs's criminal record until after the habeas petition was filed. Even if the state courts would view this omission as a procedural default, Crivens has established cause, excusing the default, for purposes of federal law. *See Amadeo v. Zant*, 486 U.S. 214, 222, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). We will not penalize Crivens for presenting an issue to us that he was unable to present to the state courts because of the state's miscon-

*See Lieberman v. Washington*, 128 F.3d 1085, 1091 (7th Cir.1997).

duct. *See Reed v. Ross,* 468 U.S. 1, 14, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984) ("[T]he failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met."); *see also Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) ("[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that 'some interference by officials' . . . made compliance impracticable, would constitute cause under this standard." (citations omitted)). As we discuss more fully below, the state's failure to provide Crivens with Childs's criminal history prejudiced him by removing a valuable method by which he could have impeached one of the state's primary witnesses. Thus, we find no procedural default and proceed to the merits of Crivens's *Brady* claim.

## C. Crivens's *Brady* Claim

■ Crivens alleges that the state denied him due process by failing to comply with his request for the criminal history, specifically the arrest records and rap sheets, of the state's witnesses for impeachment purposes. During the habeas proceedings, Crivens learned that Childs had been convicted of possessing crack cocaine with the intent to deliver it and sentenced to thirty months probation prior to Crivens's trial. In addition, another court had issued a warrant for his arrest because he failed to appear on charges of criminal trespass to a vehicle. Crivens argues that had he known this information, he would have used it to impeach Childs, whose testimony played a key role in his conviction. Both parties agree, and the record clearly indicates, that the state did not disclose this information after Crivens requested it. Rather, the state chose to rely upon its previous statement that it had no information about the criminal records of any of its witnesses.

■ The suppression or withholding of impeachment evidence by the state is prohibited. Under *Brady,* "the suppres-

sion by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. As the Supreme Court clarified in *United States v. Bagley,* 473 U.S. 667, 676–77, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), impeachment evidence also falls within the scope of the *Brady* rule. *Brady* established a three-part test for dealing with these types of evidence questions. In order to succeed with a claim, a defendant must establish that (1) the prosecution suppressed or withheld evidence that (2) was favorable and (3) material to the defense. *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *United States v. Young,* 20 F.3d 758, 764 (7th Cir.1994).

■ Within this context, prosecutors have an affirmative duty to disclose such evidence and a duty to "learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 432, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). This duty arises when "the cumulative effect of all such evidence suppressed by the government . . . raises a reasonable probability that its disclosure would have produced a different result." *Id.* at 421–22, 115 S.Ct. 1555. In determining whether a reasonable probability exists, courts must focus on whether the lack of evidence impaired the defendant's ability to receive a fair trial or cast doubt upon the verdict. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 434, 115 S.Ct. 1555 (quoting *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375). Prosecutors may not simply claim ignorance of *Brady* material. *See Young,* 20 F.3d at 764. Nor may defendants cry foul if they, through a reasonable exercise of diligence, would have been able to obtain the evidence them-

selves. *See United States v. Dimas*, 3 F.3d 1015, 1018–19 (7th Cir.1993).

Neither party disputes that this impeachment information would have been favorable to Crivens. The state, however, argues that no violation occurred because it did not suppress or withhold this information *deliberately* and, therefore, should not be found to have violated the first aspect of the *Brady* test. We disagree. The state failed to respond adequately to Crivens's request. It claimed it did not learn of Childs's previous conviction and arrest because in these two instances Childs gave the police an alias: he said his name was "Maurice Childs." Criminals often use aliases, but the police are able to link the various names to a single individual through a variety of means. If the state indeed asked for the criminal history records of Childs, we find it difficult to accept that the Chicago Police Department had not or could not have discovered that Maurice Childs, who was arrested initially in August 1990,[3] was also known as Julius Childs, who had been arrested in December 1988 and again in October 1992. If nothing else, the fingerprints of these individuals would have been the same, alerting police to Childs's use of an alias. Indeed, it seems that the police did know Childs invoked aliases because the criminal history record Crivens eventually obtained lists three aliases under which Childs had been arrested, including that of "Maurice Childs." The claims of difficulty in obtaining the information about Childs expressed by the state also establishes that Crivens is not "crying foul" without having exercised reasonable diligence. If, as the state would have us believe, extracting Childs's criminal history was a complicated endeavor, how could Crivens have accomplished such a difficult feat on his own?

We recognize, however, that in most cases, a defendant who does not have information about a witness's criminal history may obtain it through the well-honored, traditional non-*Brady* method of simply asking the witness while he is testifying about his criminal history. While *Brady* is designed to aid defendants by requiring prosecutors to turn over evidence that can be used to impeach witnesses, it does not replace the expedient of asking questions to available witnesses. We cannot, however, simply apply this solution to Crivens's situation. First, the state has conceded that *Brady* required it to provide Crivens with this information. Second, we find it entirely possible that Childs would not have told the complete truth if asked about his criminal history based on the fact that he had previously lied to police officers and the courts as evidenced by his use of aliases. Thus, we conclude that the Constitution in this case required more than Crivens simply asking Childs about his criminal history while he was under oath.

While we have determined in prior cases that a prosecutor's failure to provide evidence of a witness's criminal record did not rise to the level of suppression or withholding so as to create a *Brady* concern, we reached this result only after concluding that "the government diligently searched the pertinent criminal records for information on [the witness], asked [the witness] directly about his criminal history, and disclosed all of its information to [the defendant]." *Young*, 20 F.3d at 764. In *Young*, the defendant raised a *Brady* claim because the Illinois prosecutor failed to provide him with a witness's Mississippi criminal records. *Id.* Unlike the prosecutor in *Young*, who did not possess the information about a witness's criminal record that was in the possession of another state, the state in this case had the information at its disposal. We agree with other circuits that have explained that "the availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether

---

**3.** Childs was arrested under the alias "Maurice Childs" again in May 1996. In addition, police arrested Childs in March 1991 under the alias of "Maurice Davis" and again in October 1993 under the alias "Devon Davis."

the information is in the possession of some arm of the state." *See United States v. Perdomo,* 929 F.2d 967, 971 (3d Cir. 1991); *see also Martinez v. Wainwright,* 621 F.2d 184, 186–87 (5th Cir.1980). We conclude, therefore, that the state did, as a matter of law, improperly withhold Childs's criminal history record from Crivens.

Thus, we are left to consider whether the district court correctly determined that Childs's criminal record was immaterial. Suppressing or withholding of *Brady* material constitutes a constitutional error when the "evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley,* 473 U.S. at 678, 105 S.Ct. 3375. Childs's testimony forms the heart of the state's case against Crivens. The state trial court based its finding of guilt upon the testimony of Childs, who testified that he saw Crivens shoot Lyons, and Kelly, who testified that he saw Crivens running from the scene, but was inside the store at the time of the shooting. The trial court stated that this case was not a "single finger," or one eyewitness, case, but was "what you might call a finger and a half in that the defendant was also identified by another person present at the scene." That other person, however, was Kelly. He did not see the shot being fired. Rather, he testified that after the shot was fired, he ran outside of the store and, at that point, saw Crivens turn to run away from the scene. The state trial court found the testimony of both Childs and Kelly credible, concluding that it "didn't hear any reason why either one of them would get on the stand and lie." The court also stated that the similarity of the testimony of these two individuals increased the credibility of the identification. Thus, the credibility of these two witnesses, while within the sound discretion of the trial court, played a pivotal role in the court's ultimate decision.

We find the idea that the state withheld evidence that Crivens could have used to impeach the testimony of the state's key witness extremely troubling. While the fact that Childs had prior convictions might not in and of itself have deterred the state trial court from convicting Crivens based on Childs's testimony, Childs's use of aliases as they related to these convictions could have damaged his credibility in the eyes of the state trial court. By assuming new identities, Childs has demonstrated a propensity to lie to police officers, prosecutors, and even judges. Thus, his criminal history indicates the ease with which he has lied to such individuals in the past and could have impacted the state trial court's assessment of his credibility.

When the credibility of a witness plays a pivotal role in a conviction, it may become an issue upon which we will reverse a conviction. In *Giglio v. United States,* the Supreme Court concluded that the state's withholding of information regarding the prosecutor's promise not to prosecute a witness if he testified violated the defendant's due process rights. 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Because the government's case "depended almost entirely" upon that witness's testimony, his "credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Id.* While noting that the facts of *Giglio* regarding the prosecution's misconduct differ from the case before us because in *Giglio* the defense counsel asked the witness about any promises made by the prosecution not to prosecute him, the witness lied, and the prosecutor did not alert the court to the lie, we look to it for support of the proposition that determining the credibility of a witness may be an important enough issue upon which to reverse a conviction. Like the government's case in *Giglio,* the state's case against Crivens rested primarily upon Childs's eyewitness testimony that he saw Crivens shoot his friend Lyons. Childs's run-ins with the law and lying repeatedly about his identity would certainly have cast some

doubt on at least one of the state's key witnesses. It would have perhaps given the trial court the reason it did not find to decide that he might have been lying again.

If Childs's credibility had been damaged, the state's case would have been severely damaged. Kelly's testimony recounting Crivens's flight might have been less persuasive standing alone, and the court might have found Crivens's witnesses more credible. At the very least, "the value of ... those witnesses would have been substantially reduced or destroyed." *See Kyles*, 514 U.S. at 441, 115 S.Ct. 1555. It is not our place as an appellate court to conclude definitively how this information might or might not have impacted the trial court's ultimate conclusion. It is enough that it undermines our confidence in the outcome. We, therefore, disagree with the district court's conclusion that "there is no probability that the result of petitioner's trial would have been different had [it] known all the facts concerning [Childs's] record." We believe the introduction of Childs's criminal history and his habit of lying to police and judges could have affected his credibility in this case and, thus, may have led the state trial court to a different outcome.

While we understand the burden *Brady* places upon the state to make judgment calls regarding what evidence should be turned over to the defense, we find the state's failure to comply with a direct request and court order inexcusable. The state's response, like that in *Bagley*, could have "misleadingly induced defense counsel to believe that [the state's witnesses] could not be impeached. ..." *See Bagley*, 473 U.S. at 683, 105 S.Ct. 3375. The atmosphere created by such tactics is one in which we highly doubt a defendant whose life or liberty is at stake can receive a fair trial.

Finally, the state contends that at the very least, we should only consider the evidence of Childs's conviction and not his arrest, because, under its reading of Illinois law, a witness's prior arrests may not be admitted to impeach him except to show bias or a motive to testify falsely. While its interpretation of Illinois law may be correct, *see People v. Triplett*, 108 Ill.2d 463, 92 Ill.Dec. 454, 485 N.E.2d 9, 15 (1985), it is not our role to decide issues regarding the admissibility of evidence in the first instance. Therefore, while we conclude that the state denied Crivens's his right to due process because it failed to provide him with Childs's criminal record, we leave the decision as to whether the information regarding Childs's arrest is admissible to the state trial court.

### III. Conclusion

Because we find Crivens's *Brady* claim sufficient to establish that his constitutional right to due process had been violated, we do not address the other claims within his petition. Accordingly, we REVERSE the district court's denial of Crivens's writ of habeas corpus and REMAND this case to the district court with directions to issue an order granting the petition for a writ of habeas corpus, unless Illinois provides Crivens with a new trial in accordance with this opinion within 120 days.