In the

# United States Court of Appeals

### For the Seventh Circuit

No. 02-4100

RALPH PRUITT,

*Petitioner-Appellant*,

*v.*

EUGENE MCADORY, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 2115—**Joan B. Gottschall**, *Judge.*

ARGUED MAY 28, 2003—DECIDED JULY 25, 2003

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Ralph Pruitt asks this Court to reverse the district court's decision and grant his petition for a writ of habeas corpus under 28 U.S.C. § 2254, contending that his state conviction for sexual assault and attempted armed robbery was procured in violation of the Constitution. Pruitt argues that the prosecution engaged in impermissible gender discrimination in violation of the Fourteenth Amendment's Equal Protection Clause by using its peremptory challenges to strike only males from the venire. He also argues that he was denied a fair trial when the prosecution, in violation of its duty under the Due Process Clause, withheld from him information

that the prosecution's chief witness appeared to testify against him only after a judge imposed an appearance bond, raising the threat of forfeiture of the bond and arrest if she failed to appear. For the following reasons, we affirm the district court's denial of his petition.

## HISTORY

On November 24, 1992, Pruitt was sentenced to natural life imprisonment, under Illinois's habitual offender statute, after a Cook County, Illinois jury found him guilty of the aggravated criminal sexual assault and attempted armed robbery of Naomi Sims. The evidence against Pruitt offered at trial consisted primarily of the testimony of Sims, who told the jury that Pruitt had put a knife to her throat, attempted to rob her, and then raped her in an abandoned building.

Pruitt's concerns with the fairness of his trial began early in the proceedings. Immediately following the selection of the jury, Pruitt objected to the prosecution's use of its peremptory challenges, arguing that prosecutors were impermissibly exercising the challenges to strike prospective jurors based on their gender. The trial court ruled that Pruitt had failed to make out a *prima facie* showing of discrimination by the prosecution, and the case proceeded to trial.

Also prior to the trial, the prosecution had a rather difficult time in finding Sims and securing her presence at various proceedings. It appears that prosecutors located her only after learning that she had been arrested on an unrelated prostitution charge. The Assistant State's Attorney prosecuting Pruitt then had Sims brought before a judge, where she signed an agreement providing for the execution of a $5,000 appearance bond. Under Illinois law, should Sims have then failed to appear at trial, she would have forfeited the $5,000 and would fur-

ther have been subject to arrest and imprisonment. Neither the existence of the agreement nor the appearance bond was disclosed to Pruitt; in fact, his attorney only learned of its existence after Pruitt had been convicted.

Pruitt unsuccessfully appealed his conviction and sentence to the Illinois Appellate Court, challenging the prosecution's use of its peremptory challenges during jury selection. Because Pruitt learned about the existence of the appearance bond after his direct appeal had been taken, he raised the nondisclosure issue in a separate post-conviction challenge. The Illinois Appellate Court consolidated the direct appeal and the post-conviction petition, ultimately denying relief on both grounds. The Illinois Supreme Court denied him leave to appeal either issue.

On March 27, 1997, Pruitt filed this petition for habeas relief in the United States District Court for the Northern District of Illinois, challenging the legality of his conviction on four grounds: (1) that the evidence against him was insufficient to support his conviction; (2) that he was denied the right to a speedy trial under the Sixth Amendment; (3) that the prosecution improperly used its peremptory challenges to strike prospective jurors on the basis of gender in violation of the Fourteenth Amendment's Equal Protection Clause; and (4) that the prosecution failed to disclose that the key witness against him was compelled to appear at his trial by a $5,000 appearance bond. After briefing by both parties, the district court denied Pruitt's petition on all grounds save the third. *United States ex rel. Pruitt v. Page*, No. 97 C 2115, 1999 U.S. Dist. LEXIS 13123, at *32 (N.D. Ill. Aug. 20, 1999).[1]

---

[1] The district court subsequently granted Pruitt's motion for reconsideration of its ruling on his speedy trial claim but, after Pruitt filed an amended petition further addressing that issue,
(continued...)

As for the nondisclosure of the appearance bond, the court held that the Illinois Appellate Court's decision was not contrary to federal law. *Id.* at *31. It noted that "[w]hile the evidence of Sims' bond would have been relevant, in context it was not material" under the Supreme Court's decision in *United States v. Bagley*, 473 U.S. 667 (1985). *Pruitt*, 1999 U.S. Dist. LEXIS 13123, at *31.

The district court did rule that the Illinois Appellate Court had unreasonably applied federal law, as identified by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), by finding that Pruitt had failed to make out a *prima facie* case of gender discrimination in the prosecution's use of its peremptory challenges. *Pruitt*, 1999 U.S. Dist. LEXIS 13123, at *22. The court held that Pruitt had, in fact, made such a showing and was entitled to a hearing on the issue. Rather than conditionally granting Pruitt's petition by providing for his release unless the State held a hearing on his *Batson* claim, the court decided that it would conduct the hearing itself, evaluate the evidence, and determine whether the peremptory challenges were exercised for discriminatory reasons. *Id.* at *34.

The evidentiary hearing was held on November 19, 2001. The district court heard from the two Assistant State's Attorneys who prosecuted Pruitt, Joe Howard and Laura Morask, who testified as to their reasons for using six of their seven peremptory challenges to strike only men from the venire. As the district court later noted in its order, the hearing was held some nine years after Pruitt's

---

[1] (...continued)

denied relief on that ground. *United States ex rel. Pruitt v. Page*, No. 97 C 2115, 2000 U.S. Dist. LEXIS 20731 (N.D. Ill. Nov. 14, 2000). Pruitt has not raised the speedy trial claim on appeal.

trial, and the prosecutors' testimony was based in part on their review of the *voir dire* transcript and Morask's contemporaneous notes. *United States ex rel. Pruitt v. Page*, No. 97 C 2115, slip op. at 4 n.3 (N.D. Ill. Sept. 26, 2002). Nevertheless, the district court found that the two witnesses had sufficient recall of the trial to testify adequately and sincerely as to the reasons they had for striking each of the six male venire members. *Id.* at 13.

After hearing testimony from the two prosecutors, the district court issued its order denying Pruitt habeas relief on the *Batson-J.E.B.* issue. *Id.* at 14. While the court found that Pruitt had established a *prima facie* case of gender discrimination, it held that the prosecution witnesses had articulated "neutral reasons [that were] clear, specific, related to the case at hand, and sufficient to rebut Pruitt's *prima facie* case." *Id.* at 6. The court went on to hold that, based on its review of the record and its evaluation of the demeanor of the witnesses, the prosecution's proffered reasons for the use of peremptory challenges were credible and not simply a pretext for impermissible gender discrimination. *Id.* at 13. The court therefore denied Pruitt's petition, disposing of his last remaining ground for relief. Pruitt timely appealed to this Court for a review of the district court's decision on two of the original four grounds he had asserted.

## ANALYSIS

In reviewing the district court's decision to deny Pruitt's habeas petition, "[w]e review . . . factual findings for clear error and legal conclusions as well as mixed questions of law and fact *de novo.*" *Harding v. Walls*, 300 F.3d 824, 827 (7th Cir. 2002). The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), however, significantly constrains federal court review of state court decisions. Under that statute, habeas relief should only be granted if a

state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2003). Once the clearly established governing legal principles are identified, we must then determine whether the Illinois Appellate Court's decision in Pruitt's case was either "contrary to, or involved an unreasonable application of" those legal principles.

### A. *Nondisclosure of the Appearance Bond*

We begin with Pruitt's claim that he was denied a fair trial, as guaranteed by the Due Process Clause of the Fourteenth Amendment, because of the State's failure to disclose the existence of the appearance bond guaranteeing Sims's presence at his trial. The Supreme Court has made clear that the due process guarantee includes protection against the nondisclosure to the defense of favorable and material evidence in the possession of the prosecution. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."). The Court has further explained that "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. at 676 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

The *Brady* duty to disclose favorable evidence does not mean that the prosecution is required to turn over its entire case file to the defense. *Bagley*, 473 U.S. at 675. Rather, the key to triggering the duty to disclose is the materiality of the evidence to the question of guilt: "We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has dis-

closed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under *Brady*. A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quotations and citations omitted). In *Bagley*, the Supreme Court further sought to clarify this concept of materiality, noting that "a constitutional error occurs . . . only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." 473 U.S. at 678. The Court went on to explain that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682 (Blackmun, J.); *id.* at 685 (White, J., concurring in that sentence).

In this case, Pruitt argues that evidence of the appearance bond guaranteeing Sims's presence at trial was both favorable and material to his defense—and therefore should have been disclosed by the prosecution. He contends that Sims's testimony, as the State's chief complaining witness, was central to the prosecution's case against him, and that evidence of the appearance-bond agreement could have been used to impeach her testimony. He directs our attention to *Crivens v. Roth*, a case in which we held that the prosecution's withholding of the criminal history of its key trial witness was a sufficient ground on which to grant the defendant's habeas petition. 172 F.3d 991, 998 (7th Cir. 1999). In that case, we stated that "[w]hen the credibility of a witness plays a pivotal role in a conviction, it may become an issue upon which we will reverse a conviction." *Id.* at 998. Pruitt argues that because Sims's testimony was critical to the prosecution's case against him, any evidence that bore on her credibility was therefore material to the question of his guilt or innocence. He further argues that

the existence of the appearance bond could have been used to expose what he believes was Sims's perjurious testimony regarding her motivation for testifying against him, when Sims stated at trial that she was testifying because she "want[ed] to." (Tr. D-51.)

In addressing Pruitt's claim, the Illinois Appellate Court noted that while it did not "condone the State's failure to disclose to defendant the existence of the bond-secured agreement, in this case, the failure to do so did not result in prejudice to defendant nor deny him a fair trial." *People v. Pruitt*, Nos. 1-93-0162 & 1-94-3562, slip op. at 15 (Ill. App. Ct. Nov. 22, 1995). Important to the court's analysis were the facts that the record failed to indicate that Sims had been promised leniency in exchange for her testimony or that she had been required to testify in any particular manner, and that material witness bonds (and the penalties for violating them) were authorized under state law.[2] *Id.* at 14-15. The Illinois court therefore denied relief on the nondisclosure issue.

On habeas review, we consider whether the Illinois Appellate Court's decision was "contrary to, or involved an unreasonable application of" federal law. The district court concluded that while evidence of the appearance bond may have been favorable to Pruitt, it was nevertheless not material to the question of his guilt or innocence.

---

[2] The Illinois Code of Criminal Procedure provides: "[T]he judge may require any material witness for the State or defendant to enter into a written undertaking to appear at the trial, and may provide for the forfeiture of a sum certain in the event the witness does not appear at the trial. . . . Any witness who executes a recognizance and fails to comply with its terms shall, in addition to any forfeiture provided in the recognizance, be subject to the penalty provided in Section 32-10 of the 'Criminal Code of 1961' . . . for violation of bail bond." 725 ILL. COMP. STAT. 5/109-3(d) (2003).

*Pruitt*, 1999 U.S. Dist. LEXIS 13123, at *30-32. The court observed that "[d]efense counsel knew that Sims had failed to appear in the past, giving him an opening to bring out her reluctance to testify, and he did so. It would have been clear to the jury that Sims had to be pressured to testify. Had they also been told that she knew she would be subject to arrest and bond forfeiture if she failed to appear, it is unlikely that it would have made a difference in their appraisal of the evidence." *Id.* at *32. The court, concluding that the nondisclosure of the evidence did not undermine its confidence in the outcome of Pruitt's trial, held that the Illinois Appellate Court's decision was not contrary to federal law.

We agree that the Illinois court's resolution of this issue was neither contrary to nor an unreasonable application of the *Brady* disclosure rule. The evidence of the appearance bond was certainly favorable to Pruitt, in the sense that it would have given him another basis on which to question the motivation for Sims's testimony against him. But when the defense was already aware of Sims's reluctance to testify and had full opportunity to question her about it at trial (*see* Tr. 109-111, 114), this additional piece of evidence was not material, as the Supreme Court has explained that term in *Bagley*, so much as it was cumulative on the issue of motivation. *Cf. United States v. Milan*, 304 F.3d 273, 288 (3d Cir. 2002) (finding no *Brady* violation in part because "the additional evidence would have been merely cumulative" (citations omitted)). We do not believe that giving Pruitt the opportunity to inform the jury that the prosecution had invoked the Illinois Code of Criminal Procedure to ensure Sims's presence would have raised a "reasonable probability that . . . the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Rather, like the evidence at issue in *Giglio*, the evidence of the appearance bond was "possibly useful to the defense but not likely to have changed the verdict." *Giglio*, 405 U.S. at 154.

Finally, Pruitt claims that evidence of the appearance bond was material because it would have provided a basis on which he could have questioned the veracity of Sims's statement that she was testifying "[b]ecause [she] want[ed] to." This statement, he argues, demonstrates her propensity to testify falsely—and Pruitt reminds us that this Court has previously stated that evidence of a habit of lying to police and judges could have a negative impact on a witness's credibility, potentially undermining confidence in the outcome of a trial. *See Crivens*, 172 F.3d at 999. But we, like the district court, are not convinced that Sims's statement was necessarily false—the appearance bond may have been merely a more forceful reminder of her obligation to testify—and Pruitt already had ample information on which to question the veracity of her statement, as he was well aware of her repeated reluctance to testify at prior proceedings. At trial, he did, in fact, question Sims about her failure to appear voluntarily on prior occasions and her evasion of police attempts to locate her. As the district court put it, had Pruitt's attorney been able to point out that her appearance at trial had been secured by an appearance bond and the threat of arrest, "the jury would hardly have been surprised." *Pruitt*, 1999 U.S. Dist. LEXIS 13123, at \*32.

While full disclosure by the prosecution of the means it had employed to secure Sims's presence at trial would have been the better course here (and may have avoided questions regarding the prosecution's compliance with its ethical duties), we do not believe that had the existence of the appearance-bond agreement been disclosed to the defense, the outcome of Pruitt's trial would have been different. Therefore, the Illinois Appellate Court's decision was neither contrary to nor an unreasonable application of the federal law established by the Supreme Court in *Brady*, *Bagley*, and *Giglio*.

### B. *Gender Discrimination in Jury Selection*

Pruitt next argues that the district court erred in holding that the prosecution had not violated the Equal Protection Clause in using its peremptory challenges to strike only men from the venire, finding instead that the prosecution had offered credible, gender-neutral reasons for each challenge. Pruitt initially raised this objection at the completion of jury selection.[3] At the outset of *voir dire*, the venire consisted of 40 individuals, at least 28 of whom were male (the prosecution says 30). The prosecution exercised six of its seven peremptory challenges to strike potential jurors—all of whom were male. Pruitt's jury ultimately was comprised of nine men and three women, with one male and one female selected as alternate jurors.

After Pruitt raised his objection, the state trial court ruled that Pruitt had failed to make out a *prima facie* case of impermissible discrimination, without further elaborating on its reasoning for so ruling. (Tr. CC-178.) Because the trial court had not required the prosecution to explain or justify its actions during *voir dire*, the Illinois Appellate Court discussed a number of permissible, yet entirely hypothetical, reasons that the prosecution may have had to exclude potential jurors. Noting these possible reasons, it went on to affirm the trial court's ruling, holding that "the court's decision that defendant did

---

[3] Because, at the time of Pruitt's trial, the Supreme Court had yet to address the applicability of the federal Equal Protection Clause to discrimination on the basis of gender in the use of peremptory challenges, the objection was made on state-law grounds. Before the Illinois Appellate Court rendered its decision in Pruitt's appeal, however, the Supreme Court decided *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994). The Illinois Appellate Court therefore applied *J.E.B.* to Pruitt's case, as it was pending on appeal.

not establish a *prima facie* case of gender discrimination is not against the manifest weight of the evidence." *Pruitt*, slip op. at 11-12 (Ill. App. Ct.).

On habeas review, the district court found that the Illinois court's determination that Pruitt had failed to establish a *prima facie* case of gender discrimination was an unreasonable application of federal law established by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79 (1986) and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). In *Batson*, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment governs the use of peremptory challenges by a prosecutor in a criminal trial, prohibiting the use of such challenges to strike potential jurors on the basis of their race. 476 U.S. at 89. Eight years later, in *J.E.B.*, the Court concluded that the Equal Protection Clause also prohibits the use of peremptory challenges to strike potential jurors solely on the basis of their gender. 511 U.S. at 129.

Since the *Batson* and *J.E.B.* decisions, this Court has on many occasions reiterated the three-step process required to establish a violation of the Equal Protection Clause. *See, e.g.*, *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 939-40 (7th Cir. 2001). First, the party alleging the impermissible use of the peremptory challenge must establish a *prima facie* case of intentional discrimination. *J.E.B.*, 511 U.S. at 144-45 (suggesting that analysis of gender-based discrimination claims should follow the approach outlined in *Batson*). For purposes of this appeal, we will assume, without deciding, that the district court was correct in holding that the Illinois court erred and that Pruitt had indeed made the requisite showing.

Once the challenging party has made a *prima facie* showing, the second step in the *Batson-J.E.B.* analysis requires the party exercising the peremptory challenge

to come forward, if it can, with a gender-neutral explanation for the strikes. *See Batson*, 476 U.S. at 97. This is not a difficult step to overcome: "Any neutral reason, no matter how 'implausible or fantastic,' even if it is 'silly or superstitious,' is sufficient to rebut a *prima facie* case of discrimination." *United States v. Evans*, 192 F.3d 698, 701 (7th Cir. 1999) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)). The explanation "merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual." *J.E.B.*, 511 U.S. at 145. If gender-neutral reasons are given, the analysis shifts to the third step: the court must determine if the explanation is a mere pretext for discrimination. At this stage, the burden remains on the party alleging the impermissible use of the peremptory challenge to prove intentional discrimination. *See Batson*, 476 U.S. at 93 ("As in any equal protection case, the burden is, of course, on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination." (quotation omitted)); *Purkett*, 514 U.S. at 768 ("[T]he ultimate burden of persuasion regarding [the impermissible] motivation rests with, and never shifts from, the opponent of the strike.").

Because, in the district court's opinion, Pruitt had established a *prima facie* showing of intentional discrimination, he was entitled to move to the second stage of the *Batson* analysis. The district court therefore held an evidentiary hearing to elicit the prosecution's actual reasons for exercising its peremptory challenges, rather than relying on hypothetical rationales.[4] *See Pruitt*, 1999

---

[4] Pruitt suggests that holding an evidentiary hearing to determine the prosecutor's intent some nine years after the trial was not an appropriate remedy in his case. Rather, he argues, a new trial should have been ordered because determining the

(continued...)

U.S. Dist. LEXIS 13123, at *26. The two Assistant State's Attorneys who prosecuted Pruitt appeared at the hearing, offering rather specific explanations, clearly related to the issues involved in the rape trial of a prostitute, for each of the six peremptory challenges. State's Attorney Howard testified to their general strategy in choosing a jury:

> We were looking for a very liberal jury. We were looking for a jury that would not condemn Ms. Sims for being a cocaine user and would not hold that against her or hold it against her that she was out at 3:00 o'clock in the morning smoking crack, wandering around the streets. We needed a jury who would be very liberal, who would be perhaps understanding of someone who was a drug user. And we were looking for someone, I would say, an urban juror, who would have had some contact with these types of people. And

---

[4] (...continued)
intent of the prosecutors was impractical. *See Barnes v. Anderson*, 202 F.3d 150, 156 (2d Cir. 1999) ("If [the court] concludes that the passage of time has unduly impaired [its] ability to make a fair determination of the [non-movant]'s intent, [the court] may so state, in which event the . . . court shall order a new trial." (quotation omitted)). The State argues that any such challenge on this basis has been waived, as this is the first time Pruitt has raised it. Even so, Pruitt's argument would not have prevailed.

In this case, the district court concluded, and the testimony at the evidentiary hearing confirmed, that the passage of time had *not* unduly impaired the ability of the court to fairly determine the prosecution's intent. The prosecutors (after reviewing the *voir dire* transcript and trial notes) were able to recall a great deal of information about the jury-selection process—sincerely and honestly, in the district court's opinion. *See Pruitt*, slip. op. at 13 (N.D. Ill.). Given this, we cannot say the district court erred in choosing the remedial path it did.

if not contact, then at least some knowledge of people like [Sims].

(Hr'g Tr. at 19-20). This generally meant that the prosecution, according to State's Attorney Morask, wanted "people who lived in Chicago, more than people who lived in the suburbs because . . . people who lived in Chicago would have a better idea of the realities of crime and that anybody can be victimized." (Hr'g Tr. at 103.) In sum, the prosecutors testified that they had the entirely rational and legitimate goal of selecting jurors who would hear the evidence without starting from a position of bias against the prosecution's key witness. According to the prosecutors, the six jurors they struck had no contact with the urban areas of Chicago, no experience with crime—either as a victim or as the family or friend of a victim—and no other basis on which the prosecutors believed they could relate to the victim in this case.

Given these legitimate, gender-neutral reasons for striking the six male jurors, the court turned to the third step of the *Batson* analysis: determining whether the proffered reasons were pretextual. "It is not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. Here, the district court found the proffered explanations persuasive, noting that "[t]he prosecutors who testified appeared sincere and honest as they explained their reasons for striking six male venire members." *Pruitt*, slip. op. at 13 (N.D. Ill.). The district court was able to observe the demeanor of both witnesses and thus, as is typical, was better positioned than an appellate court to judge the veracity of the proffered explanations. Given that, "the trial court's

determination represents a finding of fact of the sort accorded great deference on appeal. We cannot reverse a trial court's finding that proffered, race-neutral, reasons for a strike were credible unless the court's finding is clearly erroneous—even if we find it dubious." *Dunham v. Frank's Nursery and Crafts, Inc.*, 967 F.2d 1121, 1124 (7th Cir. 1992) (quotation omitted); *see also Alverio*, 253 F.3d at 940 ("Once the trial judge has been persuaded of the neutrality of the . . . reason for striking a juror, we have no basis for reversal on appeal unless the reason given is completely outlandish or there is other evidence which demonstrated its falsity." (quotations omitted)).

Pruitt contends, however, that the district court's analysis—and ultimate acceptance—of the prosecution's justifications was flawed because the court considered them on a juror-by-juror basis, rather than considering them as part of the totality of the circumstances. *Cf. Coulter v. Gilmore*, 155 F.3d 912, 921 (7th Cir. 1998) (holding that the trial court erred in failing to consider the "totality of the circumstances" when evaluating defendant's *Batson* claim). *Coulter* makes clear that, "the crucial and determinative inquiry in a *Batson* claim is whether the state has treated similarly situated venirepersons differently based on race [or, after *J.E.B.*, gender]." *Id.*

Pruitt complains in his brief that "the district court looked to the reasons offered to justify striking each individual male juror without considering whether the reason was applied equally to males and females." That claim, however, is directly refuted by the district court's opinion, which addressed that very analysis under the heading "Comparing Males and Females." *Pruitt*, slip. op. at 11-14 (N.D. Ill.). In fact, the district court compared two women who were ultimately accepted as jurors (one was an alternate) with the six men stricken by the prosecution. While acknowledging that the women shared an undesirable characteristic (as the prosecution saw it)

with the men—that is, they lived in the suburbs—the court also observed that they possessed characteristics that the stricken men did not. One stated that she had a daughter who had previously been injured as the victim of a fight (perhaps allowing her to better empathize with other crime victims), while the other declared that she had a low tolerance for rape. The district court found that these responses demonstrated that the six stricken men and these two selected women were not "similarly situated," *id.* at 14, and any differential treatment could be justified by non-gender-based differences.

Picking jurors is a complex and multifaceted process. Individual factors or characteristics often do not provide the "silver bullet" that will mean acceptance or rejection of any potential juror. Rather, it is a combination of factors that will determine whether a party believes a juror will be favorable to their side: "The decision to challenge a juror will often rest on the interplay of various factors." *Dunham*, 967 F.2d at 1126. Pruitt has failed to establish that the prosecution's proffered reasons for striking the six male jurors were designed to hide impermissible discrimination. That, considered in combination with the other evidence relied on by the district court (including the fact that the venire was at least 70 percent male, making it statistically less likely for a woman to be stricken, and the fact that the prosecution did not use its seventh peremptory challenge to strike another male), leads us to conclude that Pruitt's conviction was not attained in violation of the Equal Protection Clause. The district court was therefore correct in denying Pruitt's petition on this ground.

## CONCLUSION

For the foregoing reasons, the decision of the district court denying Pruitt's petition for a writ of habeas corpus is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*